**AUTOHAUS BRUGGER, INC.,
Plaintiff-Appellee,**

**v.**

**SAAB MOTORS, INC., and Saab-Scania
of America, Inc.,
Defendants-Appellants.**

**No. 75–2338.**

United States Court of Appeals,
Ninth Circuit.

Jan. 18, 1978.

---

Raoul D. Kennedy (argued), Oakland, Cal., for defendants-appellants.

Jeffrey J. Parish (argued), San Francisco, Cal., for plaintiff-appellee.

Before BARNES and ANDERSON, Circuit Judges, and CRAIG,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

In this case Autohaus Brugger, Inc. (Autohaus), a franchised automobile dealer, brought suit against Saab Motors, Inc. (Saab), alleging breach of their franchise agreement and violation of the Automobile Dealers Day in Court Act [15 U.S.C. §§ 1221–1225]. The jury found in favor of Autohaus and awarded $200,000 in damages. The trial court denied Saab's posttrial motions for judgment n. o. v., directed verdict, and new trial. Saab appeals. Because we find the evidence wholly insufficient to support either a breach of contract claim or a violation of the Dealers Day in Court Act, we reverse.[1]

15 U.S.C. § 1222 allowed the dealer to bring his action in the district court below. Our jurisdiction rests with 28 U.S.C. § 1291.

## BACKGROUND

Autohaus is an automobile dealership located in Redwood City, California, and is a wholly-owned subsidiary of Brugger Marketing Systems (BMS). Hubert Brugger is the President of Autohaus, as well as the majority shareholder of BMS. Autohaus came into existence in 1965 and had, at that time, one store (a dealership selling point) which was located in Palo Alto, California. At that time it sold and serviced only Mercedes Benz automobiles. In 1968, Autohaus built another store in Redwood City. The Palo Alto store was then managed by another subsidiary of BMS, which in 1969 executed the first of several nonexclusive one-year franchise agreements with Saab to sell and service Saab automobiles in the Palo Alto area. In 1971 Autohaus executed a similar agreement to become a franchised Saab dealer in the Burlingame, California, area.

These one-year franchise agreements were renewed in 1971 and in effect until September 30, 1972, when they came up again for renewal. These agreements were not renewed by either party, although there is convincing, unrebutted evidence in the record to show that Saab tried repeatedly to get Autohaus to renew. Finally, on December 20, 1972, Saab wrote to Autohaus and stated that Saab would not be renewing the franchise agreements. Shortly thereafter, Saab granted the franchise to another dealer who took over the sales and service of Saab automobiles for that area.

## I. RELATIONSHIP BETWEEN THE PARTIES

### A. THE WARRANTY CLAIMS.

■ The key to this case is the issue of warranty claims. A warranty claim is a dealer's claim to the automobile manufacturer for reimbursement of the cost of parts and labor that a dealer has put into repairing a retailed automobile which is still covered by the manufacturer's warranty.

Under the franchise agreement[2] between Saab and Autohaus, Saab agreed to reim-

---

* Honorable Walter E. Craig, Chief Judge, United States District Court, District of Arizona, sitting by designation.

1. We would also reverse on the grounds that the evidence is wholly insufficient to support the award of $200,000 in damages. However, since we find no liability, we need not discuss this issue.

2. This agreement in pertinent part states:
 "Company agrees that it will be responsible for handling the 'Warranty.' Dealer agrees to install new parts to replace defective parts without charge to the original purchaser. Reimbursement for such defective parts will be made by Company to Dealer without cost to the latter. Company agrees to credit Dealer with the labor cost involved in installing such parts, provided that the replaced parts are determined to be defective by Company. Labor credit shall be based upon a suggested Time Schedule and Dealer Warranty Labor Rate established by Company, which said Schedule may be amended by Company from time to time at its sole discretion. Dealer agrees to submit Warranty claims directly to Company in accordance with the existing Company Policy.
 "Dealer agrees to perform warranty work on all SAAB automobiles covered by the terms of the 'Warranty', whether or not such automobiles have been sold by Dealer, and Company agrees to honor all legitimate warranty claims made by dealer whether or not such claims pertain to automobiles sold by Dealer." (Pl.Ex. 166, p. 4).

burse Autohaus for defective parts covered by the factory warranty and to reimburse Autohaus for the labor cost involved in installing these parts. The amounts for which Saab agreed to reimburse Autohaus on the labor charge were based on a suggested time schedule and labor rate established by Saab. This rate schedule is referred to as a "flat rate manual." For example, if an automobile was still within the factory warranty period and the crankshaft was found defective, then Autohaus would replace it. If the "flat rate manual" lists this job as a ten-hour job on a Saab model 99, (see e. g., Plaintiff's Exhibit # 291), then a proper claim to Saab for reimbursement would include the cost of the crankshaft as well as ten hours for labor charges.

From the beginning of their relationship these warranty claims created problems. Autohaus several times complained to Saab that the warranty claims were not promptly and fully reimbursed. These complaints increased in 1972, and, as shall be seen, were a substantial factor in the nonrenewal of the franchise relationship.

These warranty claims are the key to this case because Autohaus alleges that Saab owed reimbursement on these claims to Autohaus, that Saab refused to pay, that Saab tried to coerce Autohaus into dropping the claims, and finally that Saab terminated Autohaus because the claims were not dropped. Autohaus contends that this was a violation of the Automobile Dealers Day in Court Act, supra.

Our first inquiry then is to determine whether there is any evidence from which the jury could determine that Saab in fact owed any warranty monies to Autohaus, and, if so, whether they used them to coerce Autohaus in any manner.

At different times Autohaus made varying claims to Saab of amounts which Autohaus considered due. On November 30, 1971, Autohaus wrote to Saab and stated that according to their books Saab owed $4,627.04 on old warranty claims (Pl.Ex. # 9). In June of 1972 this figure was both $10,054.70 (Pl.Ex. # 86) and "over

$8,000.00" (Pl.Ex. # 87). In September this figure was both $19,386.23 (Pl.Ex. # 104) and $15,008.08 (Pl.Ex. # 105).

Autohaus arrived at these figures through its warranty claims register. Whenever Autohaus would perform work it felt was warranty related, it entered the claim into the warranty register. If Saab paid (or credited) the claim to Autohaus, then the bookkeeper would credit the warranty register and the amount would no longer be shown as owing. However, if Saab did not give Autohaus credit for the warranty work done or only paid the claim partially, then the remainder of the claim was still shown as owing in the warranty register. This situation occurred even if Saab's rejection and nonpayment of the claim was perfectly valid. This, of course, meant that Autohaus would be carrying a claim that the warranty register said was owing, but which, in fact, was not owing.

The evidence shows that most, if not all, of the remaining claims in the warranty register were the type of claims which Autohaus had improperly submitted or Saab had already validly rejected.

For example, if Saab would receive a warranty claim and the reimbursable labor time claimed by Autohaus was over the allowed "flat rate" time, then Saab would reimburse for the agreed upon "flat rate" time and would reject the remainder of the warranty claim for the excess time. The warranty register still carried the claim for the excess time. Hubert Brugger admitted on cross-examination that "some of these claims showed higher labor than Saab allowed for that particular job to be paid." (R.T. 410) Gary Martin, a parts and service manager for Autohaus, testified that if a warranty repair took four and one-half hours to perform, and if the flat rate manual allowed three hours, then he would "regularly" submit a claim to Saab for the full four and one-half hours. (R.T. 1092) He stated that "if I felt we deserved the time we spent legitimate time on the car, certainly I would claim it." (R.T. 1099) When asked if Saab would honor that additional time, Martin said "In most cases, no." (R.T. 1099)

Charles Grelle was Autohaus' parts and service director. After stating that part of the problem with these warranty claims may have been Saab's fault, he also testified:

"Q. In the course of analyzing the claims and meeting with Mr. Soane, did you form the opinion that part of the reason for the [warranty] dispute was fault on Autohaus Brugger's end?

A. [Grelle] Yes.

Q. And were you able to determine what seemed to be the reason for the fault on Autohaus Brugger's end?

A. Well, the only thing that I could say was I could not substantiate some of them. That's not to say there wasn't substantiation somewhere, but I couldn't find it. Therefore I couldn't very well consider that a proper claim.

Q. Were there any of Autohaus Brugger's claims that you felt had been submitted in an incomplete form?

A. Yes." (R.T. 1367–1368)

On April 5, 1972, Saab's Regional Manager, Mark Boli and its District Sales Manager, Michael Long, met with Hubert Brugger and his assistant, Ronald Bartolucci, to try and clear up these warranty problems. Boli told Bartolucci that he would leave soon for Saab's headquarters in Orange, Connecticut, and he asked Bartolucci to give him copies of the disputed claims and with respect to each claim the claim number, owners' name and chassis number, so that he could have Saab's home-office staff examine them in an effort to resolve the difficulties. (Pl.Ex. # 88) It was not until three months later, on June 27, 1972, when Bartolucci sent Boli a list of 70 claims (Pl.Ex. # 87). However, Saab claims these were without the claim numbers, owners' names, and chassis numbers as Boli had requested at the April 5 meeting. On July 3 Boli acknowledged receipt of the claims, and told Bartolucci that Saab would review them as soon as Autohaus provided it with complete information as requested. (Pl.Ex. # 88)

Shortly after this letter, Bartolucci left Autohaus and the warranty claims problem was assigned to Charles Grelle. In August, Saab's service manager, George Soane, met with Grelle and together the two of them reviewed each of the unpaid claims Saab had not paid, and they took a sampling of those Saab had partially paid. They concluded that Saab owed Autohaus on some of the claims and not on others. On some claims Saab had actually overpaid Autohaus. There were other claims on which they could not reach agreement. (Pl.Ex. # 105)

On August 24, Boli again met with Brugger to try and resolve the warranty dispute. At that time, Brugger claimed that Saab owed Autohaus $15,008.08 on the warranty claims. (Pl.Ex. # 204) He suggested as a compromise that Saab pay the amount it conceded it owed and that the remainder be split on a "fifty-fifty" basis. Boli instead offered to spend whatever time was necessary to review each of the remaining claims, but he was not willing to split the claims on a certain percentage basis regardless of their merit. Brugger adamantly refused to spend any more time in reviewing the remaining claims.

Shortly thereafter, on September 1, 1972, Brugger wrote to Saab and demanded payment for the warranty claims. He claimed in this letter that $19,386.23 was due. He also stated:

"It is our intention to obtain legal assistance for the collection of our receivables, if the accounts are not completely cleared by the 11th of September 1972" (Pl.Ex. # 104).

On September 14, 1972, Boli replied to Brugger, stating that:

"According to the information that you presented, you had $15,008.08 on your books as unpaid warranty claims by Saab . . . . Mr. Garelli [Grelle] and Mr. George Soane have reviewed your warranties and 'per your spreadsheet' you showed we owed $9,095.43. Of this figure we have agreed we owe $5,067.45, which includes resubmitted claims. Also,

there is $158.61 of which you claim we owe 50%. There is $2,569.18 which Mr. Garelli [Grelle] stated we did not owe, and $1,300.19 is in dispute.

\* \* \* \* \* \*

"You also presented another spread sheet which you considered partial payments, total amount of $5,912.60. In discussing this I explained to you that these have been paid and were not brought up in review of warranty claims by Mr. Bartolucci, your former vice president, and were just handed to us by Mr. Garelli [Grelle]. We did not feel that this was eligible for review as these claims had been paid and if there were any shortages in payment, they should have been brought up at that time.

\* \* \* \* \* \*

"Enclosed is a detailed analysis for me by Mr. Soane explaining the disposition of each warranty claim presented to us for review . . . . I am sure if you make a thorough investigation of this situation, you will find a great amount of these problems to be internal." (Pl.Ex. # 105)

Attached to this letter were numerous sheets of warranty claims, which set forth an explanation for the manner in which Saab handled each claim. A sampling of these explanations reads like this:

"This claim was reduced on the labor rate. Claimed for 27.1 hours—reduced to 8.5 hours";

"This claim is for a 1,000 mile service, not warranty";

"Work on R.O. is not warranty work, claim copy does not show chassis No. or date of sale."

While Brugger received this letter and the detailed analysis of the claims, he testified that he did not review it in any detail. He referred the analysis to Charles Grelle, but never received back any counter-analysis of the claims from him. At trial, Brugger was unable to point to any specific claim or claims which were legitimately owed by Saab. He was not concerned with the individual claims, but rather was concerned only with the total balance showed owing by the warranty register (which, as indicated above, was not necessarily correct). And Charles Grelle testified that as far as he knew there was *no* claim which Saab admitted it owed which had never been paid. (R.T. 1391).

In order to satisfy its burden of proof that warranty claims were owed by Saab, Autohaus needed to present specific evidence of that fact. This, they cannot do. At trial, in their brief, and at oral argument here, Autohaus has totally failed to produce any evidence of any single warranty claim which was definitely owed by Saab and which was not paid. We have searched the entire 1,896 pages of the transcript in this case and still can find no evidence of a single claim which was validly owed by Saab and not paid. True, the warranty register shows that certain amounts were "claimed" by Autohaus, but in no sense does this mean that the amounts were legitimately owed. As we have already discussed, Autohaus conceded that many of the claims in the warranty register were over and above the amounts Saab in the franchise agreement had agreed to pay. Soane's analysis of the outstanding claims shows why Saab had rejected the claims. In the appendix to its brief, Saab lists eleven claims (showed as owing in the warranty register), which Saab contends were validly rejected and not owing. Autohaus was unable at trial, and is unable here, to present any evidence to refute Saab's position that the claims were not legitimately owing.

The only evidence which Autohaus can point to to suggest that Saab owed Autohaus on the warranty claims is interrogatory No. 69. In the answer to this interrogatory, Saab agreed that it owed Autohaus $2,905.58.[3] However, where Autohaus suggests that this answer shows that Saab owes this amount on warranty claims (Autohaus' Opening Brief, p. 8), this is misleading because the interrogatory itself reads:

"What amount, if any, is currently owed by Saab to plaintiff *in connection with*

---

**3.** This figure should read $2,876.73 due to a mathematical correction (R.T. 1887).

*any matter whatsoever,* including amounts owed in connection with warranty claims made by plaintiff?" (C.R. 93, R.T. 939) (emphasis added).[4]

Of this $2,905.58 figure, Autohaus cannot point to one single specific warranty claim which is included in the figure and was not paid. Nor can Autohaus prove that this figure is anything other than the normal expenses which Saab would incur when winding up a franchise arrangement such as that with Autohaus.

Our inquiry through the record, the trial transcript, and the many exhibits in this case leads us to the inescapable conclusion that Autohaus has failed to carry its burden of proof and show that legitimate warranty claims were owed by Saab. We find that there is just no evidence from which a reasonable jury could find that Saab owed money to Autohaus on the warranty claims. It follows then, that with no warranty monies due, Saab could not have used them to "coerce" Autohaus as Autohaus alleges.

· B. *FRANCHISE RENEWAL EFFORTS AND WHO WANTED TO TERMINATE WHOM?*

In July of 1972, while the warranty dispute was going on, Michael Long went to Autohaus' outlet in Burlingame to obtain an order for cars. Long was Saab's district manager and responsible for selling cars to the dealers. He tried to sell some new cars to Autohaus because he felt that Autohaus' inventory was falling to a comparatively low level considering the market where Autohaus was located. At that time Brugger told him that Autohaus refused to order any more cars until Saab satisfied the war-

ranty claims. (R.T. 180–182). Brugger also instructed Garrison Paul, the manager of the Burlingame store, Jurgen Von Beekum, the general manager of the Palo Alto store, and Peter Widdershoven, a sales manager, that they were to order no more Saab cars for inventory until Saab settled on the warranty claims (R.T. 180, 677, 1275, Pl.Ex. # 93).

On August 24, 1972, Long returned to Autohaus to secure an order for cars. Brugger again refused. In his report back to Saab, Long wrote:

"Mr. Brugger gave an ultimatum that Saab pay his request on warranty claims today—or else. He refused to order cars to bring his inventory up to a satisfactory level. He will not voluntarily terminate and he will not cooperate." (Pl.Ex. # 101)

Four days later, on August 28, Long again contacted Brugger to try and sell Autohaus some new cars for inventory. Brugger's response when asked to buy more cars was "No, I will not." (R.T. 304) He indicated he would not order any more cars until Saab settled the warranty dispute around his "proposal" which was the fifty-fifty split of the contested claims (regardless of their merit).

Brugger exhibited the same attitude about renewing the franchise agreements. That is, he didn't want to discuss renewal until the warranty situation was cleared up. The evidence also showed that Brugger was disenchanted with the franchise with Saab and had a desire to get out from under the agreement. At one point in July of 1972, Brugger observed to Garrison Paul that he would like to get out from under the agree-

---

**4.** Interrogatory No. 68 reads: "Commencing on what date did Saab refuse to reimburse plaintiff for warranty work performed by plaintiff on Saab Automobiles?"

The answer to Interrogatory No. 68 reads: "Saab never refused to reimburse plaintiff for warranty work performed by plaintiff on Saab automobiles. See also answer to Interrogatory No. 50." (C.R. 93)

Interrogatory No. 50 reads: "State the basis on which Saab refused to reimburse plaintiff for Saab warranty work performed by plaintiff after December 20, 1972."

The answer to Interrogatory No. 50 reads: "Saab did not refuse to reimburse plaintiff for Saab warranty work performed by plaintiff after December 20, 1972. All warranty claims submitted by plaintiff were processed in accord with standard procedures. To the extent that individual claims were refused, such refusal was based on the failure of the particular claim to qualify under Saab's standard warranty policies." (C.R. 88)

ment because it was "driving him crazy with the expense and so-forth" (R.T. 199). He also observed to Paul that he would have to let Saab terminate him since under that situation Saab would "have to settle the whole thing up and take back the parts. . . ." (R.T. 199) Peter Widdershoven testified that sometime during the summer or early fall of 1972, he asked Brugger about getting rid of Saab. Brugger replied "Let's wait and see what happens. I'd rather have them terminate me than vice versa." (R.T. 1286) Widdershoven also testified that sometime prior to December of 1972 Brugger had told him that he was attempting to maneuver Saab into a position where he could sue them. (R.T. 1296) And, finally, the minutes of an Autohaus staff meeting held late in 1972 show that "A.B.I. [Autohaus] is in a more advantageous position by having Saab cancel franchise and not us." (R.T. 485)

While we find substantial evidence in the record to show that Saab tried to get Autohause to renew the franchise agreement both before and after the September 30 expiration date, we find no evidence that Autohaus ever sought out or made any request to Saab that the franchise be renewed.

All during this controversy in 1972 the sales of Saab cars at Autohaus continued to drop, as did the inventory. (R.T. 152). For example, in October of 1972 Autohaus took delivery of only two cars from Saab and none thereafter. (R.T. 944).

By mid-December of 1972 Saab still had not received any indication whatsoever from Autohaus that it genuinely wished to continue as a franchised dealer. As Saab notes, "all indications were to the contrary" (Saab Opening Brief, p. 13). Finally, on December 20, 1972, W. Donald Carmack, Saab's vice president of sales and marketing wrote to Autohaus and stated that they would not renew the franchise. In his letter he stated:

> "As you know, the term of both of those agreements ended on September 30, 1972. After considerable analysis of your selling performance, it has been determined

that we will not be renewing those Agreements. The reason for our decision concerns your inability to sell the number of Saab automobiles that both of us have projected as a reasonable amount given the population, affluence and other factors connected with the areas in which you have been operating." (Pl.Ex. # 115).

Autohaus rejected the reason given by Saab for the nonrenewal of the franchise and instead claimed that the real reason for the nonrenewal was Saab's "attitude towards payment of [the] warranty claims." (Pl.Ex. # 119). This litigation followed.

## II. STANDARD OF REVIEW

As mentioned, Saab moved for a directed verdict, a judgment n. o. v., or in the alternative a new trial. Upon denial of these motions, Saab appeals.

The standards for granting a judgment n. o. v. and for a directed verdict are the same. *Cockrum v. Whitney*, 479 F.2d 84, 85 (9th Cir. 1973).

When considering the propriety of the grant or denial of a motion for judgment n. o. v. or a directed verdict, the correct standard is:

> ". . . whether or not, viewing the evidence as a whole, there is substantial evidence present that could support a finding, by reasonable jurors, for the non-moving party. *Butte Copper & Zinc Co. v. Amerman*, 157 F.2d 457, 458 (9th Cir. 1946). 'Substantial evidence is more than a mere scintilla.' *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Butte Copper & Zinc Co., supra.* The evidence must be examined in a light most favorable to the nonmovant, *Continental Ore v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696 & n. 6, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), and there can be no weighing of evidence. *Tennant v. Peoria & Pekin Union Ry.*, 321 U.S. 29, 35, 64 S.Ct. 409, 88 L.Ed. 520 (1944). Finally, appellant here is entitled to the benefit of all *reasonable* inferences that may be drawn from its evidence. *Standard Oil Co. v. Moore*, 251 F.2d 188,

198 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958)." *Chisholm Brothers Farm Equipment Co. v. International Harvester,* 498 F.2d 1137, 1140 (9th Cir. 1974), cert. denied, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298.

After reviewing the entire record with these principles in mind, we are left with "the definite and firm conviction that a mistake has been committed" by the trier of fact. *United States v. United States Gypsum Co.,* 333 U.S. 364, 394–395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Anderson v. United States,* 555 F.2d 236, 237 (9th Cir. 1977). We hold under the facts of this case that the evidence is wholly insufficient to support a reasonable jury's finding in favor of Autohaus on either the breach of contract claim or violation of the Dealers Day in Court Act. *Brady v. Southern Railroads,* 320 U.S. 476, 64 S.Ct. 232, 88 L.Ed. 239 (1943). A motion for directed verdict should be granted "where there is no substantial (or 'believable') evidence to support" any other verdict. *Hawkins v. Sims,* 137 F.2d 66, 67 (4th Cir. 1943); 5A Moore Federal Practice ¶ 50.02[1] 2d Ed., 1968 and

cases cited therein; *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir., en banc, 1969), *Wagle v. Murray,* 560 F.2d 401 (9th Cir. 1977). Therefore, the trial court's denial of Saab's motion for judgment notwithstanding the verdict was error and we reverse and vacate the judgment.

## III. *DEALERS DAY IN COURT ACT*[5]

The purpose[6] of the Dealers Day in Court Act is to supplement the antitrust laws of the United States and permit a franchised automobile dealer to bring suit for damages in the United States district courts for the failure of the automobile manufacturer to act in good faith in performing or complying with any of the terms of provisions of the franchise, or in terminating, canceling, or not renewing the dealer's franchise. House Report No. 2850, 84th Cong. 2d Sess. (1956), 1956 U.S.Code Cong. & Admin.News, p. 4596.

Good faith is defined as the duty of a dealer and a manufacturer "to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion

---

**5.** The pertinent portions of this Act read:

"1221(e) The term 'good faith' shall mean the duty of each party to any franchise, and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party: *Provided,* That recommendation, endorsement, exposition, persuasion, urging or argument shall not be deemed to constitute a lack of good faith."

"§ 1222. Authorization of suits against Manufacturers; amount of recovery; defenses

An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer: *Provided,* That in any such suit the manufacturer shall not be barred from asserting in defense of any such action the failure of the dealer to act in good faith."

**6.** One of the major reasons for passage of the Dealers Day in Court Act was to balance the power between the automobile manufacturers and the dealers. In its reasons for the Act, the House Report stated:

Concentration of economic power in the automobile manufacturing industry of the United States has developed to the point where legislation is required to remedy the manifest disparity in the ability of franchised dealers of automotive vehicles to bargain with their manufacturers. Investigations of the automobile industry, moreover, demonstrate a continuing trend toward greater concentration, as well as abuse by the manufacturers of their dominant position with respect to their dealers. These investigations have disclosed practices and conditions which require new legislative methods and a change in established concepts. The bill as amended proceeds from the conclusion that in the automobile industry concentration of economic power has increased to the degree that traditional contractual concepts are no longer adequate to protect the automobile dealers under their franchises.

House Report No. 2850, 84th Cong.2d Sess. (1956), 1956 U.S.Code & Admin.News, pp. 4596–97.

or intimidation from the other party." 15 U.S.C. § 1221(e).

There is no question that the failure to exercise good faith within the meaning of the Act has a limited and restricted meaning. It is not to be construed liberally. *Milos v. Ford Motor Co.*, 317 F.2d 712 (3rd Cir. 1963), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 125. It does not mean "good faith" in a hazy or general way, nor does it mean unfairness. The existence or nonexistence of "good faith" must be determined in the context of actual or threatened coercion or intimidation. *Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp.*, 461 F.2d 608 (7th Cir. 1972), *cert. denied*, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245; *Salco Corp. v. General Motors Corp.*, 517 F.2d 567 (10th Cir. 1975); *Overseas Motors, Inc. v. Import Motors Limited*, 519 F.2d 119 (6th Cir. 1975), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304; *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir. 1974), *cert. denied*, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106; *McGeorge v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir. 1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674; *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2nd Cir. 1970); *Cecil Corley Motor Co., Inc. v. General Motors Corp.*, 380 F.Supp. 819 (M.D.Tenn.1974).

In order to lack good faith the manufacturer's actions must be unfair and inequitable in addition to being for the purpose of coercion and intimidation. *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510 (10th Cir. 1976).

Coercion or intimidation must include a wrongful demand which will result in sanctions if not complied with, *Fray Chevrolet Sales, Inc. v. General Motors Corp.*, 536 F.2d 683 (6th Cir. 1976), and it is necessary to consider not only whether the manufacturer brought pressure to bear on the dealer, but also his reason for doing so. *Rea v. Ford Motor Co., supra*, 497 F.2d at 585, *Overseas Motors, Inc. v. Import Motors Limited, supra*, 519 F.2d at 124.

When a termination or nonrenewal of a franchise is involved, there must be a "causal connection" between the dealer's resistance to the coercive conduct and the termination or nonrenewal for there to be a lack of good faith under the Act. *Autowest, Inc. v. Peugeot, Inc., supra*, 434 F.2d at 561.

The existence of coercion or intimidation depends upon the circumstances arising from each particular case. However, unless the transactions between the parties involve coercion or intimidation, or threats or coercion or intimidation, the duty of good faith imposed by the Act does not prohibit a manufacturer's "recommendation, endorsement, exposition, persuasion, urging or argument normal in competitive commercial relationships." House Report 2850, *supra* (1956 U.S.Code Cong. & Admin.News at p. 4596).

If the evidence discloses normal sales recommendation or persuasion, the manufacturer will not be liable. The Act also does not prohibit the manufacturer from terminating or refusing to renew the franchise of a dealer who is not providing the manufacturer with adequate representation. Nor does the Act curtail the manufacturer's right to cancel or not to renew an inefficient or undesirable dealer's franchise. (Id. at p. 4603).

In *Randy's Studebaker Sales, supra*, the Tenth Circuit noted several examples of what actions did not constitute lack of good faith:

"Thus, a manufacturer who refuses ·to renew a franchise is not guilty of lack of good faith where the dealer has failed to comply with the franchise terms for a long period of time. Nor in the case of one who has had sub-standard sales performance. Or if the· dealer should have inadequate financial resources, termination of the franchise is not in bad faith. Elimination of a dealer who has sold its manufacturer-approved location and seeks to move to a location not in keeping with the manufacturer's metropolitan planning does not establish a lack of good faith on the part of the manufacturer. And where the dealer refuses to take all

of the manufacturer's line of cars, choosing instead to continue to deal in competitor cars, lack of good faith is not shown by refusal to renew the franchise." (Footnotes omitted) 533 F.2d at 515.

For some examples of where courts have found that manufacturer's actions do lack good faith and violate the Act, *see McGeorge v. Leyland Motor Sales, Inc.*, 504 F.2d 52 (4th Cir. 1974) (where the manufacturer tried to compel the dealer to accept an undesirable line of cars by withholding delivery to the dealer of a highly successful line of cars); *Rea v. Ford Motor Co.*, 497 F.2d 577 (3rd Cir. 1974) (where the manufacturer threatened to cease shipping Ford cars, unless a separate corporation, in which dealer was a principal stockholder, resigned its franchise as an Oldsmobile dealer in a neighboring town); *Autowest, Inc. v. Peugeot, Inc.*, 434 F.2d 556 (2nd Cir. 1970) (where the manufacturer terminated the dealer because the dealer resisted the manufacturer's coercion to follow the suggested resale price); *Randy's Studebaker Sales, Inc., v. Nissan Motor Corp., supra* (where the manufacturer used the nonrenewal weapon, as well as curtailment of car deliveries in order to coerce the dealer into a program of retail price fixing); and *Shor-Line Rambler, Inc. v. American Motor Sales*, 543 F.2d 601 (7th Cir. 1976) (where the manufacturer put unreasonable and unrealistic demands on the dealer to build new facilities, increase credit, and make extensive personnel changes, then terminated the dealership when it could not comply.)

Autohaus contends that there are seven areas where the evidence shows that Saab violated the Dealers Day in Court Act. While we disagree that these show *any* evidence of a violation of the Act, we shall briefly discuss each claim. These claims are:

(1) *That Saab attempted to intimidate Autohaus to drop its warranty claims.*

■ As we have already extensively discussed, the record is barren that Saab owed and withheld *any* legitimate warranty claims from Autohaus. With no warranty claims owing, it would not be possible for Saab to use these to "coerce" Autohaus into doing something it did not want to do.

(2) *That Saab imposed arbitrary and coercive sales quotas.*

During the early days of their franchise relationship, Saab and Autohaus agreed that as a twelve-month-sales objective, Autohaus would try and sell 120 units. (Pl.Ex. # 171). Autohaus did not reach this number of sales for any twelve-month period, nor did very many other Saab dealers, as Saab nationwide faced strong competition in the import field.

■ It is true that a violation of the Act may occur when a manufacturer sets an unrealistic goal (which none of its dealers can meet) and then selectively terminates one dealer for failing to meet that goal. *See, e. g.,* the reasoning of Judge Will in *Madsen v. Chrysler Corp.*, 261 F.Supp. 488 (N.D.Ill.1966), *vacated as moot*, 375 F.2d 773 (7th Cir. 1967). However, in this case, for Autohaus to suggest that Saab violated the Dealers Day in Court Act by merely agreeing to or establishing the sales objective, completely misses the mark. First, Saab did not use as grounds for the nonrenewal of the franchise the fact that Autohaus had not sold the 120 cars. Rather, Saab did not renew the franchise because of Saab's analysis of Autohaus' selling performance which, as we have discussed, *supra*, was not very good. Secondly, and even more importantly, there is not one shred of evidence to suggest that Saab ever used the 120-unit sales objective to coerce Autohaus (*i. e.,* Saab never threatened Autohaus either to make the sales objective or to be terminated). Quite the contrary, the evidence strongly shows that even though Autohaus did not make the sales objective, Saab still tried repeatedly to obtain Autohaus' renewal of the franchise agreement.

(3) *That Saab threatened to place Autohaus on C.O.D. status for parts.*

■ At times, during the franchise, Hubert Brugger admitted that Autohaus was

in default on some of his payments for parts purchased from Saab (R.T. 319). Because of these delinquencies, some of the internal personnel at Saab suggested amongst themselves that Autohaus be placed on C.O.D. status for parts. Brugger testified that on August 24, 1972, Boli mentioned to him that Saab was "contemplating" putting Autohaus on C.O.D. status. Apparently, sometime around this period it was discovered that Autohaus was not delinquent in its parts account and Autohaus was never put on C.O.D. status.

Even if we were to assume that this C.O.D. issue was directed as a threat to Autohaus (which we do not feel the evidence demonstrates), we find no way for this to be a violation of the Act. Once a dealer has become delinquent in its accounts, the manufacturer has every right to protect itself. Nor do we find any "causal connection" between the "threat" and some action which Autohaus would be coerced to take in the alternative. Autohaus obliquely argues in its brief that the "threat" was that Autohaus drop its warranty claims or else be put on C.O.D. Keeping in mind our discussion, *supra*, of the warranty claims issue, we find this argument to be without merit.

(4) *That Saab attempted to coerce Autohaus to inflate its inventory.*

 The legislative history of the Dealers Day in Court Act clearly states that one of the violations of the Act would be for the manufacturer to coerce the dealer into accepting "automobiles, parts, accessories, or supplies which the dealer does not need, want, or feel the market is able to absorb." The legislative history goes on to provide that this "may *in appropriate instances* constitute coercion or intimidation." (1956 U.S.Code Cong. & Admin.News at p. 4603) (emphasis added).

True, Michael Long did visit Autohaus several times and solicit orders for Saab cars. This was his job. He solicited orders from *all* of the dealers in his sales district. Here again, we find absolutely no evidence of any coercion in Long's attempts to sell Autohaus some cars. Nor do we find any "causal connection" between the alleged "coercion" and something which Autohaus was supposed to be "coerced" into doing, and which it had a right not to do (other than the same oblique allegation regarding the warranty claims).

We find Long's attempts to solicit orders from Autohaus for new cars to be nothing more than the "recommendation, endorsement, exposition, persuasion, urging, or argument normal in competitive commercial relationships" which is clearly permitted under the Act. House Report No. 2850, *supra*, (1956 U.S.Code Cong. & Admin.News at p. 4596).

Autohaus' statement in its brief (p. 22) that "Mr. Long testified he told Mr. Brugger that he must cooperate or terminate," is nothing other than pure misstatement of the record.[7]

(5) *That Saab improperly denied Autohaus' order for 1973 models.*

On November 28, 1972, some two months after the franchise expiration, Peter Widdershoven, Vice President and Sales Manager of Autohaus, per Hubert Brugger's specific instructions, ordered fourteen new 1973 model cars from Saab. This order did not specify any colors which was customary for car orders. Saab wrote a letter back stating that not all of the units ordered were available, that the new 1973 models were in short supply, and that these cars were being shipped to dealers who already had "sold orders" for the new models.

Hubert Brugger testified that his order was a serious good faith order. However, a

---

7. Michael Long's testimony, which Autohaus refers to on this matter was:

"Mr. Brugger, I meant that he would not voluntarily terminate. Mr. Brugger refused to sign a selling agreement, [the franchise renewal] he refused to buy cars. He was twenty-five percent of my business and he was putting me out of business. I said 'Would you sign the selling agreement?' He refused. I said 'Will you terminate so I can get somebody that will do the job?' It was just that simple." (R.T. 1673–74)

review of Peter Widdershoven's testimony indicates that Brugger's order was not a good faith order, but instead was merely a method to find out where Autohaus stood as a dealer for Saab. Brugger told Widdershoven something to the effect of "Let's order some '73 cars and see what happens." (R.T. 1281). It should also be kept in mind here that Brugger also told Widdershoven at one point that he was attempting to maneuver Saab into a position where he could sue it. (R.T. 1296).

■ A willful and arbitrary refusal by a manufacturer to deliver to a dealer the models ordered can violate the Dealers Day in Court Act where there is coercion, intimidation, or threats of coercion or intimidation which is "causally connected" to the refusal to deliver. *See, e. g., Rea v. Ford Motor Co., supra,* 533 F.2d 510.

■ Even if the jury were to find in this case that Autohaus' order for new cars was bona fide and that Saab had the cars but refused to deliver them, there is no evidence from which a jury could find that Saab tried to coerce or intimidate Autohaus by withholding the cars.

(6) *That Saab's "Pilot Scheme" was coercive.*

■ Saab put certain dealers with above average warranty costs on a "pilot scheme" whereby the warranty work was watched more closely. Under this scheme Autohaus and some other dealers were required to withhold some of their warranty claims until the Saab service representative had given his approval.

Autohaus argues that the scheme was an attempt by Saab to force Autohaus to reduce its warranty claims. Autohaus contends that the scheme was coercive because Saab merely selected Autohaus on the basis of high cost "without *any* indication that [Autohaus'] claims were improper" (Autohaus Opening Brief, p. 26) (emphasis in original). This statement by Autohaus is a patent fabrication. As we have discussed, *supra,* Saab had numerous indications that

Autohaus' warranty claims were improper, either in their submission or the claim itself. And, furthermore, at trial, Hubert Brugger, as well as several of his employees, *admitted* that many of the claims submitted were improper.

In any event, we find no evidence from which the jury could have found that the "pilot scheme," instituted by Saab to watchdog excessive warranty claims, was in any way coercion in violation of the Dealers Day in Court Act.

(7) *That Saab threatened to replace Autohaus with another dealer.*

■ The evidence here again is insufficient to show that there was a threat to replace Autohaus with another dealer. There is also no evidence to suggest that if there was a threat, that it was used to coerce or intimidate Autohaus.

■ And, as the legislative history points out, appointing a new dealer in the same area is not a violation of the Act unless the action is used as a method of coercion. House Report No. 2850 states:

"The [Act] does not freeze present channels or methods of automobile distribution and would not prohibit a manufacturer from appointing an additional dealer in a community provided that the establishment of the new dealer is not a device by the manufacturer to coerce or intimidate an existing dealer. The committee emphasizes that the [Act] does not afford the dealer the right to be free from competition from additional franchised dealers. Appointment of added dealers in an area is a normal competitive method for securing better distribution and curtailment of this right would be inconsistent with the antitrust objectives of this legislation." (1956 U.S.Code Cong. & Admin.News, at p. 4603–04).

## IV. *BREACH OF CONTRACT CLAIM*

Autohaus' primary argument [8] on the breach of contract claim is that as a matter

---

**8.** Autohaus raises several other points which they contend show Saab's breach of contract. However, from our review of the evidence, we find them to be without merit and we need not discuss them.

of law the franchise agreement was continued after the September 30, 1972, expiration date. Autohaus then contends that with the franchise agreement in effect, Saab's "termination" on December 20, 1972, was a breach of the continued agreement. We disagree.

Autohaus contends that the franchise agreement was extended by the conduct of the parties. Such conduct which Autohaus contends continued the agreement is that Autohaus continued to sell, service and do warranty work after September 30, 1972, that Saab continued to send literature to Autohaus, and that one of Autohaus' employees attended a Saab dealership meeting in November. Autohaus relies on *Martin v. Campanaro*, 156 F.2d 127 (2nd Cir. 1946), *cert. denied*, 329 U.S. 759, [67 S.Ct. 112, 91 L.Ed. 654] which states:

"A contract implied in fact derives from the 'presumed' intention of the parties as indicated by their conduct. When an agreement expires by its terms, if, without more, the parties continue to perform as theretofore, an implication arises that they have mutually assented to a new contract containing the same provisions as the old."

Autohaus stops the quote at this point. However, the quote continues on to read: "Ordinarily, the existence of such a new contract is determined by the 'objective' test, i. e., whether a reasonable man would think the parties intended to make such a new binding agreement—whether they acted as if they so intended." 156 F.2d at 129.

 We find as a matter of law that the franchise agreement here did not continue in effect past the September 30, 1972, expiration date for two reasons. First, under the standards of the *Martin* case, the evidence as discussed, *supra*, leads to the inescapable conclusion that Hubert Brugger did not want the franchise to continue. In short, we find no way that a reasonable person would think that Autohaus (Hubert Brugger) "intended to make such a new binding agreement." Secondly, and most importantly, the original franchise agreement itself, which Brugger signed, states that acceptance of orders or continuance of sales or any other act by Saab after termination[9] of the agreement "*shall not be construed as a renewal of this Agreement for any further term.*" (Pl.Ex. # 171) (emphasis added).[10]

## CONCLUSION

The verdict of a jury should not lightly be set aside—certainly not for the mere reason that a court may disagree with it. However, in this case we are convinced that this verdict for the plaintiff, if allowed to stand, would be a legally unjustified windfall to the plaintiff and a miscarriage of justice. Therefore, we are compelled to reverse. Since Saab has admitted that a sum of $2,876.73 is the final balance owing on the Autohaus account (see jury instruction, R.T. 1882–1883, 1886–1887), we reverse and vacate the judgment below and remand this case to the district court for the entry of a judgment in favor of Autohaus in that amount (*Neely v. Eby Construction Co.*, 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967), 28 U.S.C. 2106), together with interest from the date of the original judgment. Rule 37, F.R.A.P. Costs are allowed to appellant. Rule 39(a) F.R.A.P.

REVERSED, VACATED and REMANDED with instructions.

---

**9.** We find that the terms "termination" and "nonrenewal" as used in this particular circumstance are synonymous.

**10.** We note in passing that the trial court erred when it left the interpretation of the franchise contract up to the jury. The interpretation of a written contract is a question of law for the court to determine. *See* 4 Williston on Contracts § 616, p. 649, et seq.