**NORTH BROADWAY MOTORS, INC., an Illinois corporation, Plaintiff,**

v.

**FIAT MOTORS OF NORTH AMERICA, INC., a foreign corporation, Defendant.**

**No. 84 C 2007.**

United States District Court, N.D. Illinois, E.D.

Sept. 4, 1984.

Richard H. Balog, Shearer, Blood, Agrella, Boose & Balog, St. Charles, Ill., for plaintiff.

David N. McBride, Teresa E. Raizen, Ross & Hardies, Chicago, Ill., for defendant.

### MEMORANDUM OPINION

PRENTICE H. MARSHALL, District Judge.

This is an action by North Broadway Motors, Inc. ("North Broadway"), an automobile dealer, against Fiat Motors of North America, Inc., ("Fiat North America"), which supplied North Broadway with Fiat automobiles. In January 1976, North Broadway entered into a Dealer Sales and Service Agreement with Fiat North America that established North Broadway as a Fiat dealer. According to plaintiff's amended complaint, Fiat North America established a system of unfair and unequal quotas that had the effect of forcing plaintiff to accept a disproportionately high number of automobiles and parts as compared with neighboring Fiat dealers, thus placing plaintiff at a competitive disadvantage. Amended Complaint, Count 1 ¶¶ 7, 8. Further, Fiat North America sold new Fiat cars to automobile liquidators at "cut-rate" prices lower than the prices at which sim-

ilar cars were offered to plaintiff. *Id.* ¶ 9. Finally, defendant allegedly forced plaintiff to purchase unpopular Fiat models as a condition precedent of the purchase of more popular models. *Id.* ¶ 10. As a result of these actions, North Broadway was forced to sell its Fiat dealership at a great loss. *Id.* Count 2 ¶ 13. After plaintiff gave up its Fiat dealership, the complaint asserts, Fiat North America offered an arbitrarily low price for the repurchase of plaintiff's inventory of parts and automobiles. *Id.*, Count 6 ¶ 14.

The amended complaint is stated in eight counts. In count 1, plaintiff alleges that defendant had an implied obligation under its agreement with plaintiff to provide plaintiff a fair and equitable allocation of Fiat cars, an obligation breached by the previously-described actions. In count 2, plaintiff claims that these actions were done by defendant with malice and the intent to destroy plaintiff's business or to force plaintiff to sell his dealership at a loss. Count 3 is based on the Automobile Dealer's Day in Court Act ("Dealer's Act"), 15 U.S.C. §§ 1221–25 (1982); plaintiff asserts that defendant's actions with respect to allocation of automobiles and purchase price violated the obligation of "good faith" applicable to auto manufacturers contained in *id.* § 1222. In count 4, plaintiff asserts that these actions violated the Illinois Motor Vehicle Franchise Act ("IMVFA"), Ill. Rev.Stat. ch. 121½, §§ 751–64 (1983), which makes unlawful certain practices concerning allocation of automobiles. Count 5 is based on defendant's alleged refusal to reimburse plaintiff for two claims plaintiff made for performing repair work on Fiat cars covered by the manufacturer's warranty. In count 6, plaintiff asserts that defendant's pricing of plaintiff's inventory was arbitrary, capricious, and willful. Count 7 claims that this conduct violated the IMVFA; count 8 asserts that it violated the Dealer's Act.

Defendant has moved to dismiss all of the complaint except count 5.

## COUNTS 1 AND 2

■ Count 1 is, as we have noted, essentially a breach of contract claim. The contract is attached to the amended complaint. The only obligations it imposes on Fiat North America with respect to allocation of automobiles are as follows:

[Fiat North America] shall give careful consideration to each order received from Dealer for Fiat passenger cars and other [Fiat North America] Products....

[Fiat North America], however, will not ship any [Fiat North America] Products to Dealer, except pursuant to Dealer's specific order.

Dealer Sales and Service Agreement ¶ 13(b), (c). The agreement also provides that "there is no other agreement or understanding, either oral or in writing, between the parties affecting this Agreement or relating to the subject matter hereof." *Id.* ¶ 61(c). It also provides that defendant "shall not be under any liability to Dealer for failure to deliver ... pursuant to orders of Dealer accepted by [Fiat North America] ...." *Id.* ¶ 15. Defendant argues, based on these provisions, that there is neither an express nor an implicit agreement by defendant to provide plaintiff a fair and equitable allocation of Fiat cars. Plaintiff's only response to this is that if we read the complaint carefully we will see that it states a claim.

We have read the complaint and the agreement carefully, and we agree with defendant that there is no basis for a claim of breach of contract. Plaintiff does not allege that defendant breached its obligation to give "careful consideration" to plaintiff's orders or its undertaking not to ship products to plaintiff except pursuant to an order. In light of the integration clause contained in ¶ 61(c) of the agreement, we cannot hold defendant responsible for breaching undertakings that are not made expressly in the agreement. Count 1 is therefore dismissed for failure to state a claim upon which relief may be granted.

■ Count 2, with its allegation of malice and intent to destroy plaintiff's busi-

ness, appears to be a tort claim. Though once again plaintiff does not attempt to illuminate matters for us with respect to count 2, we must examine the complaint to determine whether its allegations provide for relief under any possible theory, even if that theory is not articulated in the complaint itself. *See Knapp v. McCoy*, 548 F.Supp. 1115, 1116 (N.D.Ill.1982) (Shadur, J.). The only tort conceivably implicated by the allegations in count 2 is interference with prospective economic advantage. There are four elements of this tort under Illinois law: 1) plaintiff reasonably expects to enter into a valid business relationship; 2) defendant knows of this expectancy; 3) defendant intentionally interferes in plaintiff's expectancy, preventing it from ripening into a valid business relationship; and 4) plaintiff suffers damages as a result of defendant's interference. *See Knapp*, 548 F.Supp. at 1117 (Illinois law); *Bank Computer Network Corp. v. Continental Illinois National Bank and Trust Co.*, 110 Ill.App.3d 492, 500, 66 Ill.Dec. 160, 166, 442 N.E.2d 586, 592 (1982).

Opportunity to obtain customers is an expectancy protected by the tort action for interference with prospective advantage. *Knapp*, 548 F.Supp. at 1117. Giving the allegations of the complaint a fair reading, plaintiff asserts that defendant's conduct concerning allocations impaired plaintiff's ability to obtain customers, as plaintiff had a poor "mix" of Fiat automobiles. As we read the complaint, plaintiff had a reasonable expectancy of which defendant was aware. Further, the allegation of malice contained in paragraph 12 of the complaint suffices as an assertion of intentional interference in plaintiff's expectancy, particularly when combined with an allegation of an intent to destroy plaintiff's business or lower its value. *Knapp*, 548 F.Supp. at 1117. Finally, plaintiff adequately alleges that it was damaged by defendant's conduct in that it had to sell its dealership at a great loss.

The caselaw also requires that a defendant's conduct be wrongful and not in accord with legitimate business practices in order to be actionable. *See Panter v. Mar-* *shall Field & Co.*, 646 F.2d 271, 298 (7th Cir.) (Illinois law), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Knapp*, 548 F.Supp. at 1117; *Bank Computer*, 110 Ill.App.3d at 500–01, 66 Ill.Dec. at 166–67, 442 N.E.2d at 592–93. As the Illinois Appellate Court has stated,

> [t]he theory of the tort of interference, it is said, is that the law draws a line beyond which no member of the community may go in intentionally intermeddling with the business affairs of others; that if acts of which the complaint is made do not rest on some legitimate interest, or if there is sharp dealing or overreaching or other conduct below the behavior of fair men [sic] similarly situated, the ensuing loss should be redressed; and that line of demarcation between permissible behavior and interference reflects the ethical standards of the community.

*City of Rock Falls v. Chicago Title & Trust Co.*, 13 Ill.App.3d 359, 362–63, 300 N.E.2d 331, 333 (1973), *quoted in Panter*, 646 F.2d at 298. It is established in Illinois law that "one who has an interest may take action to protect his rights, and even if the interference is done with malice he cannot be held financially liable for the result of his actions." *Bank Computer*, 110 Ill. App.3d at 500, 66 Ill.Dec. at 166, 442 N.E.2d at 592; *Petit v. Cuneo*, 290 Ill.App. 16, 22, 7 N.E.2d 774, 777 (1937).

It is possible that defendant will take the position that its allocations of automobiles among its dealers was devised in order to ensure that it was able to dispose of all of the automobiles it obtained from the manufacturer and/or in order to develop a market for automobiles other than the so-called "popular" models. These might be legitimate interests that defendant is legally entitled to protect. However, at present we are concerned only with the issue of the adequacy of plaintiff's complaint, and the question is therefore whether "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2

L.Ed.2d 80 (1957). We cannot simply assume that defendant acted reasonably in furtherance of its own legitimate objectives and that it did not engage in overreaching. The complaint adequately spells out the elements of a claim for interference with prospective advantage, and defendant's motion to dismiss is therefore denied as it relates to count 2.

## COUNTS 4 AND 7

Counts 4 and 7 are, as we have noted, based on the IMVDA. The IMVDA became effective in June 1979. The Illinois courts have held that the statute is to be construed as operating prospectively so as not to violate the constitutional guarantee against impairment of the obligation of contracts. *Marquette National Bank v. Loftus,* 117 Ill.App.3d 771, 73 Ill.Dec. 267, 454 N.E.2d 11 (1983); *McAleer Buick-Pontiac Co. v. General Motors Corp.,* 95 Ill. App.3d 111, 50 Ill.Dec. 500, 419 N.E.2d 608 (1981). Under *McAleer* and *Marquette,* the question whether application of the Act in a particular case would be impermissibly retroactive is determined by examining whether the Act " 'takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposed a new duty, or attaches a new disability in respects of transactions or considerations already past.' " *McAleer,* 95 Ill.App.3d at 113, 50 Ill.Dec. at 502, 419 N.E.2d at 610 (quoting *United States Steel Credit Union v. Knight,* 32 Ill.2d 138, 142, 204 N.E.2d 4, 6 (1965)).

The agreement between plaintiff and defendant was entered into over three years before the effective date of the IMVDA. Because the agreement does not impose any obligation upon defendant as to allocation of cars other than the limited duty to give plaintiff's orders fair consideration, application to defendant of the IMVDA's proscription of arbitrary and capricious allocation plans, *see* Ill.Rev.Stat. ch. 121½,

§ 754(d)(1), unquestionably would "impose[ ] a new duty" upon defendant. It does not matter that the conduct of which plaintiff complains may have come after the effective date of the IMVDA; the same was true in *McAleer,* in which the plaintiff complained of defendant's failure to renew its agreement with plaintiff in 1980. Plaintiff's only counterargument is that no specific contractual right of defendant is impaired by application of the IMVDA, as the agreement is silent with respect to allocations of cars among dealers. This argument evinces a basic misunderstanding of the nature of a contract. A contract is often as important for what it does not say as for what it requires. The agreement's silence on the subject of allocations indicates that the parties did not intend to impose upon defendant any duties concerning that subject. Thus, application of the IMVDA's proscription would add a new duty to those that Fiat North America agreed to undertake. The same was true in *McAleer,* where the contract did not limit the defendant's ability to refuse to renew its terms but the Act imposed a requirement of good cause for failure to renew. For these reasons, count 4 is dismissed for failure to state a claim.

▪ The same analysis applied to count 7, which is based on the alleged underpricing of plaintiff's inventory at the time of its repurchase by defendant. The agreement sets a formula for calculating repurchase prices, *see* Dealer Sales and Service Agreement ¶ 56, but the provision of the statute upon which plaintiff relies in count 7, § 754(b), proscribes all "arbitrary" or "unconscionable" conduct. The effect of § 754(b) is to impose upon defendant a duty to act fairly in addition to its duty to pay the contractually mandated price to the dealer. *McAleer* requires that count 7 be dismissed.[1]

---

1. The amended complaint states at Count 1, paragraph 4, that the agreement was renewed annually by the parties. Were this true, it might well mean that application of the IMVDA would not be retroactive in the circumstances of this case. However, plaintiff does not rely on such an argument in responding to the motion to dismiss, and in any event the complaint's allegation is contradicted by the plain language of the agreement, which states that it remains in effect until terminated. Dealer Sales and Service Agreement ¶ Eighth.

## COUNTS 3 AND 8

The Dealer's Act, upon which counts 3 and 8 are based, provides that an automobile dealer may bring suit against any automobile manufacturer and recover damages sustained by reason of the manufacturer's failure to act in good faith in performing or complying with the terms or provisions of a written dealership agreement or in terminating or not renewing such an agreement. 15 U.S.C. § 1222 (1982). "Good faith" is defined in *id.* § 1221 as

> the duty of each party to any [agreement] to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party
>
> . . . .

The courts have read the Act's definition of good faith literally, and thus a manufacturer may be found to have violated the obligation of good faith only if it acted in a coercive or intimidating manner toward the dealer. *See, e.g., Ed Houser Enterprises, Inc. v. General Motors Corp.,* 595 F.2d 366, 369 (7th Cir.1978) (per curiam); *Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp.,* 461 F.2d 608, 610 (7th Cir.), *cert. denied,* 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1972).

■ Coercion under the Act consists of an either-or demand, or, otherwise stated, a demand that will result in sanctions if not complied with. *See, e.g., H.C. Blackwell Co. v. Kenworth Truck Co.,* 620 F.2d 104, 107 (5th Cir.1980); *Marquis v. Chrysler Corp.,* 577 F.2d 624, 633 (9th Cir.1978); *Fray Chevrolet Sales, Inc. v. General Motors Corp.,* 536 F.2d 683, 685 (6th Cir.1976); *McDaniel v. General Motors Corp.,* 480 F.Supp. 666, 677 (E.D.N.Y.1979); *Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819, 844 (M.D.Tenn. 1974); *General Motors Corp. v. Mac Co.,* 247 F.Supp. 723, 726 (D.Colo.1965) (conduct which results in dealer acting or refraining from acting against its will). In addition, most courts have held that the coercive demand must be wrongful, unfair, or inequitable in order to be actionable. *See, e.g.,*

*Howard v. Chrysler Corp.,* 705 F.2d 1285, 1286–87 (10th Cir.1983); *H.C. Blackwell Co.,* 620 F.2d at 107; *Marquis,* 577 F.2d at 633; *Autohaus Brugger, Inc. v. Saab Motors, Inc.,* 567 F.2d 901, 911 (9th Cir.), *cert. denied,* 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); *Fray,* 536 F.2d at 685; *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510, 514 (10th Cir. 1976); *Milos v. Ford Motor Co.,* 317 F.2d 712, 716 (3d Cir.1963); *Woodard v. General Motors Corp.,* 298 F.2d 121, 127 (5th Cir.1962). *See also ShorLine Rambler, Inc. v. American Motor Sales Corp.,* 543 F.2d 601, 604 (7th Cir.1976) ("unreasonable and unrealistic" demand). *But see Conroy Datsun, Inc. v. Nissan Motor Corp.,* 506 F.Supp. 1051, 1058 (N.D.Ill.1980) (dictum). Other courts have suggested, on the other hand, that the manufacturer must take into account the dealer's economic interests in making decisions that affect the dealer. *See Colonial Ford, Inc. v. Ford Motor Co.,* 577 F.2d 106, 110–11 (10th Cir.1978), *modified in part on reh'g,* 592 F.2d 1126 (10th Cir.1979); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 561–62 (2d Cir.1970); *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437, 442 (1st Cir.), *cert. denied,* 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); *Clifford Jacobs Motors, Inc. v. Chrysler Corp.,* 357 F.Supp. 564, 574 (S.D. Ohio 1973). *See also H.C. Blackwell,* 620 F.2d at 105–07 (demands involving proper subjects but unreasonable time for compliance).

■ In any event, several courts have held that a manufacturer's insistence that a dealer accept an unfair allocation of automobiles may form the basis for a suit under the Dealer's Act. *See Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 445–46 (9th Cir.1979); *Autohaus Brugger,* 567 F.2d at 914; *American Motors Sales Corp. v. Semke,* 384 F.2d 192, 195 (10th Cir.1967); *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 55–56 (4th Cir.1974), *cert. denied,* 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975). Indeed, the legislative history of

the Act plainly demonstrates that Congress intended for such conduct to be actionable:

[t]he existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct. For example, manufacturer pressure, direct or indirect, upon a dealer to accept automobiles, parts, accessories, or supplies which the dealer does not need, want, or feel the market is able to absorb, may in appropriate circumstances constitute coercion or intimidation.

H.R.Rep. No. 2850, 84th Con., 2d Sess. 9 (1956), *reprinted in* 1956 U.S.Code Cong. & Ad.News 4596, 4603. Here, as in *Semke*, plaintiff alleges that defendant required it to accept cars and parts that it did not want and that it was forced by the downturn caused by that conduct to give up its franchise. If, in addition to this, it is necessary that an implied threat of sanctions exists, though plaintiff does not make the argument we think that such a threat lies in the fact that under the agreement, ¶ 11, plaintiff was required to keep a stock of cars, parts, and accessories adequate to meet defendant's requirements, and if he did not, cause for termination might exist under *id.* ¶ 52(b). Had plaintiff refused to accept the cars he did not want, a breach of the "adequate stock" requirement might have resulted.[2] Count 3 therefore describes conduct that may give rise to a claim under the Dealer's Act.[3]

■ Defendant argues, however, that since it is not a manufacturer of automobiles it is not a proper defendant under the Dealer's Act. Section 1222, quoted earlier, provides for lawsuits against automobile manufacturers, a term defined in § 1221(a) as anyone engaged in the manufacture or assembly of automobiles, "including any person, partnership, or corporation which acts for and is under the control of such manufacturer or assembler in connection with the distribution of said automotive vehicles." Paragraph 3 of the complaint states simply that Fiat North America is in the business of operating and issuing Fiat franchises and that it is the distributor for Fiat products manufactured by Fiat Motors, which is not a defendant here.

As presently alleged, the complaint fails to satisfy the requirements of the DDICA, for there is no allegation that defendant "acts for and is under the control" of the entity that manufactures Fiat automobiles. Plaintiff notes that the Dealer Sales and Service Agreement frequently mentions the Italian company that manufactures the cars, Fiat S.P.A, but we see nothing in the agreement to suggest that defendant is under the Italian company's control. Plaintiff has, however, asked that it be granted leave to amend the complaint to satisfy the requirements of the statute. We will permit plaintiff to do so, but in so doing we note that as we perceive the law, "control" under § 1221(a) does not require corporate affiliation or a principal-agent relationship. *See Grappone, Inc. v. Subaru of North America, Inc.,* 403 F.Supp. 123, 135 (D.N.H.1975); *DeCantis v. Mid-Atlantic Toyota Distributors, Inc.,* 371 F.Supp. 1238, 1244 (E.D.Va.1974). As the court stated in *De-Cantis,* "it is sufficient that the manufacturer has the power, by contract or otherwise, to direct the course of dealing between the wholesale distributors and its retail dealers." 371 F.Supp. at 1244. *See generally Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d at 441–42; *Barney Motor Sales v. Cal Sales, Inc.,* 178 F.Supp. 172, 175 (S.D.Cal.1959).

Though this same defect in count 8, which also arises under the Dealer's Act, can be cured by amendment, unlike count 3, count 8 does not describe conduct proscribed by the Act. No element of "coercion" is present in defendant's alleged arbitrarily low repurchase price, as there is no

---

**2.** We do not intend by this to limit plaintiff to this particular "sanction" in proving his Dealer's Act claim. The above suffices, however, for purposes of a motion to dismiss.

**3.** Plaintiff cannot, however, maintain a claim under the Dealer's Act based on the alleged price discrimination between his dealership and certain automobile liquidators. No element of "coercion" as defined by the caselaw is present in such conduct.

suggestion that an either-or demand was made such that sanctions would result upon noncompliance. That defect cannot be cured by amendment.

## SUMMARY

Defendant's motion to dismiss for failure to state a claim is granted in part and denied in part. Counts 1, 4, 7, and 8 are dismissed. Count 3 is dismissed with leave to amend within 10 days. The motion is otherwise denied. Defendant is to answer the remainder of the complaint within 20 days after plaintiff amends count 3. Previous discovery/trial schedule to stand.