780 F.2d 1049
 19 Fed. R. Evid. Serv. 1210
 WALLACE MOTOR SALES, INC., Ralph E. Wallace, Plaintiffs and
Third-Party Defendants, Appellants,
v.
AMERICAN MOTORS SALES CORPORATION, Defendant, Appellee.
WALLACE MOTOR SALES, INC., Plaintiff, Appellee,
v.
AMERICAN MOTORS SALES CORPORATION, Defendant, Appellant.
 Nos. 85-1261, 85-1283.
 United States Court of Appeals,
First Circuit.
 Argued Sept. 10, 1985.
Decided Dec. 19, 1985.
 
 Daniel A. Laufer with whom Myers & Laufer, Concord, N.H., Barbara L. Moore and Cooley, Manion, Moore & Jones, P.C., Boston, Mass., were on brief for Wallace Motor Sales, Inc. and Ralph E. Wallace.
 Allan J. Sullivan with whom Jeffrey N. Herman, Mark W. Pearlstein and Goodwin, Procter & Hoar, Boston, Mass., were on brief for American Motor Sales Corp.
 Before BOWNES, Circuit Judge, WISDOM,* Senior Circuit Judge, and TORRUELLA, Circuit Judge.
 BOWNES, Circuit Judge.
 
 I. THE PROCEDURAL HISTORY
 
 1
 These appeals arise out of an action brought by Wallace Motor Sales, Inc. (Wallace Motors) against American Motors Sales Corporation (AMC) for breach of contract and bad faith termination of Wallace Motors' automobile dealership franchise. AMC counterclaimed against Wallace Motors and its president and sole stockholder, Ralph E. Wallace (Wallace), for breach of the franchise agreement, misrepresentation, trademark infringement, restitution, debt and unfair practices. Wallace Motors' complaint contained five counts, one of which was dismissed before trial. Two were presented to the jury: the claim for bad faith termination of Wallace Motors' franchise under the Automobile Dealers Suits Against Manufacturers Act (Dealers Act), 15 U.S.C. Sec. 1221 et seq., and a claim for breach of contract based on AMC's failure to repurchase parts from Wallace Motors and to pay it for warranty work done and bonuses earned. The remaining two counts, brought under the Regulation of Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers Act, Mass.Gen.Laws Ann. ch. 93B, were decided solely by the court.[1]
 
 
 2
 AMC's counterclaim contained eight counts, one of which was dismissed. The seven remaining counts consisted of: (1) a claim that Wallace Motors and Wallace defrauded AMC of $35,000; (2) a claim for restitution of the $35,000; (3) a claim for breach of the franchise agreement; (4) a claim for unfair trade name and trademark appropriation; (5) a claim for breach of the franchise contract with respect to unfair trademark and trade name appropriation; (6) a claim for conversion of a car shipped to Wallace Motors but never paid for; and (7) a claim under the Regulation of Business Practices for Consumer Protection Act, Mass.Gen.Laws Ann. ch. 93A, for damages due to unfair and deceptive acts committed by Wallace Motors and Wallace.
 
 
 3
 The jury found for Wallace Motors and against AMC in the amount of $100,000 for violation of 15 U.S.C. Sec. 1221, and $25,000 for breach of the franchise contract for failure to pay for warranty work done, bonuses earned, and the cost of parts not repurchased. As to the issues raised in AMC's counterclaim, the jury found against AMC on its claims of misrepresentation and restitution as well as on the general breach of contract claim. It found for AMC on the claim for the conversion of the unpaid car in the amount of $7,500, and on the trademark infringement and trademark contract claims in the amount of $1,000 for each claim. The jury awarded AMC a total of $9,500 in damages.
 
 
 4
 The district court's findings on the chapter 93A and B claims were the direct opposite of the jury's findings on the counts submitted to it. The court denied Wallace Motors' two chapter 93B claims and found in favor of AMC on its chapter 93A claim. AMC's subsequent motions for judgment n.o.v. and for a new trial were denied. Wallace Motors appeals from the trial court's adverse rulings on its two chapter 93B claims and AMC's chapter 93A judgment. AMC appeals all adverse rulings.
 
 
 5
 Wallace Motors' appeal raises two issues: whether it was deprived of its seventh amendment right to a jury trial when the district court made its own independent findings of fact on the chapter 93A and B claims; and whether chapter 93B precludes an automobile manufacturer from filing a claim under chapter 93A. AMC's appeal raises three issues: the degree of coercion which must be shown to establish a lack of good faith under the Dealers Act, 15 U.S.C. Sec. 1221; the kind of evidence required to establish injury under the Dealers Act; and the authentication and foundation requirements for admitting evidence under the business records exception to the hearsay rule, Fed.R.Evid. 803(6). AMC also claims that Wallace Motors is barred from challenging AMC's right to bring a chapter 93A claim because Wallace Motors did not raise that issue below.
 
 II. THE FACTS
 
 6
 The relationship between Wallace Motors and AMC dates back to 1970, the year Wallace Motors got its first franchise from AMC. That franchise authorized Wallace Motors to sell AMC automobiles, parts and accessories in the Wilmington, Massachusetts, area. In 1977 Wallace Motors obtained an additional franchise from AMC authorizing it to sell Jeep motor vehicles. On September 10, 1982, the parties entered into a new agreement which added a Renault franchise to Wallace Motors' dealership. The circumstances surrounding the negotiation and termination of that 1982 agreement are the genesis of this action.
 
 
 7
 AMC began franchising Renault dealers in 1979 when it entered into a joint marketing venture with Renault. Thereafter AMC adopted an unofficial marketing policy of combining Renault franchises with existing AMC and Jeep franchises, wherever possible. The dealers who had already been franchised by Renault were protected against having new Renault dealerships opened up in their area; an AMC/Jeep dealer could only obtain a Renault franchise by buying out an existing Renault dealer. AMC offered to provide funds to facilitate such purchases.
 
 
 8
 Sometime in 1980, Wallace Motors learned that the Pass and Weisz dealership, located in Wallace Motors' marketing area, was willing to sell a Renault franchise. Wallace Motors made a bid to buy the franchise for $50,000. Pass and Weisz accepted, and in early spring 1982, Wallace Motors asked AMC to approve the transfer and to provide $35,000 of the purchase price. AMC promised to approve the transfer and to supply the funds sought if Wallace Motors satisfied certain operational and financial qualifications. It also demanded that Wallace Motors upgrade its facilities and refurbish its premises.
 
 
 9
 From the start, the minimal financial qualifications posed a problem. AMC informed Wallace that Wallace Motors would have to obtain a $350,000 floor plan line of credit in order to achieve the established sales planning potential for the AMC/Jeep/Renault franchise in the Wilmington market. The $350,000 figure was far in excess of any credit facilities previously enjoyed by Wallace Motors. Indeed, Wallace Motors had not had a functioning line of credit since early 1981. Moreover, it had a record of poor sales performances for the preceding two years.
 
 
 10
 The evidence conflicts sharply over how this floor plan hurdle was overcome. Wallace testified that AMC representatives at AMC's Boston zone office assured him, as Wallace Motors' principal, that the $350,000 floor plan was merely a paper requirement and that Wallace Motors could qualify if it obtained a $100,000 floor plan. Wallace Motors did in fact obtain a $100,000 floor plan from the Century Bank and Trust in May 1982. Wallace testified that he went to the Boston zone office to sign a franchise application form and several related documents once the $100,000 floor plan was in place. Wallace maintained that he signed all these papers in blank on the understanding that AMC personnel would complete the details and forward the application package to AMC's head office. AMC gave a very different account of what happened. It flatly denied that Wallace was ever told that a $100,000 floor plan would suffice. AMC's evidence was that Wallace repeatedly represented that he had obtained a $350,000 floor plan, and that he assisted at every step of the application process, providing all the information from which the details were put together.
 
 
 11
 In any event, the completed application was sent to AMC's head office in Detroit sometime in May 1982, and formally approved later that month. AMC then notified all the Renault dealers of the proposed transfer as required by state law, Mass.Gen.Laws Ann. ch. 93B. One such dealership, Border Buick AMC Renault (Border Buick) promptly filed a protest and then a lawsuit under the statute, blocking the transfer of the franchise from Pass and Weisz to Wallace Motors. The suit was dropped on September 8, 1982, after Wallace Motors' agreed to give Border Buick the right of first refusal to Wallace Motors' franchise rights. That same day Wallace Motors received the promised $35,000 from AMC and closed the deal with Pass and Weisz.
 
 
 12
 The events leading up to the termination of the franchise began about two weeks later when Century Bank rejected an AMC draft for a car being shipped to Wallace Motors. The Bank claimed that the draft exceeded Wallace Motors' credit line. AMC's files contained documents showing a $350,000 floor plan in Wallace Motors' favor at the Century Bank but subsequent inquiry revealed that these documents had been forged and that no such floor plan existed. Wallace Motors disclaimed all responsibility for the forgeries. On October 8, 1982, AMC informed Wallace that it would give him ten days to obtain a $350,000 credit line. Wallace proved unable to meet this demand and on December 23, 1982, AMC notified Wallace that it would terminate all Wallace Motors' franchises as of February 24, 1983. AMC specified Wallace Motors' failure to maintain an adequate line of credit, the misrepresentations in Wallace Motors' application, and its poor sales performance as grounds for the termination. Wallace Motors filed suit in August 1983.
 
 III. WALLACE MOTORS' CONSPIRACY THEORY
 
 13
 Wallace Motors' claim for bad faith termination alleged that AMC conspired with Bernard Ristuccia, Sr. (Ristuccia), the owner of several large automobile franchises, to get rid of Wallace Motors, and to award the Wilmington franchises to Border Buick, a dealership owned by one of Ristuccia's sons. At that time, Border Buick was one of the largest and most successful AMC/Jeep dealers in the Eastern zone. Wallace Motors claimed that AMC used it as a tool to consolidate the Wilmington AMC/Jeep franchise with the Wilmington Renault franchise, and that it laid the groundwork for terminating Wallace Motors in the process.
 
 
 14
 According to Wallace Motors, the scheme to do this was hatched at a meeting that took place in March 1982 between Ristuccia and several of the officers from AMC's Boston zone office. This was shortly after the date on which Wallace Motors had asked for funds to buy a Renault franchise and prior to the time it had been informed that AMC would provide those funds. Wallace Motors did not present any direct evidence as to the purpose of that meeting but merely cited the fact that it had taken place as proof that AMC had an opportunity to work out a scheme. Wallace Motors maintained that the events which followed that meeting were the carefully orchestrated elements of such a scheme.
 
 
 15
 First, it alleged that Victor Kray (Kray) the manager of AMC's Boston zone office, deliberately deceived Wallace into believing that he could ignore the $350,000 requirement so that AMC could ultimately cite Wallace's failure to get the credit line as a ground for termination. Second, it alleged that Kray and Warren Hanscom (Hanscom) regional sales manager for the Boston zone, were responsible for placing the forged bank documents in AMC's files and for falsifying Wallace Motors' application. According to Wallace Motors, the forgeries and falsified forms were essential to the scheme for two reasons: (a) they ensured that Wallace Motors' application initially cleared AMC so that the AMC/Jeep and Renault franchises would be combined; and (b) they provided an additional ground for later terminating the franchises. As for Border Buick's protest and the agreement to drop it in return for the right of first refusal, Wallace Motors claimed that the agreement was critical to the scheme because it ensured that Wallace Motors would not transfer the franchises to another dealer before AMC had the opportunity to terminate it. Wallace testified that AMC forced him to sign that agreement by threatening not to give Wallace Motors the funds it had promised if he failed to grant Border Buick the right of first refusal.
 
 
 16
 Wallace Motors claimed that once these steps had been taken all that remained to accomplish the goal of the scheme was to terminate its franchises. It contended that AMC deliberately exceeded Wallace Motors' credit line by "drafting" several vehicles against its credit line without any prior authorization or order so as to trigger an investigation of the bank documents and other falsified documents. It claimed further that AMC's offer to allow Wallace Motors ten days to get the required floor plan was not a genuine attempt to give it a chance to hold on to the franchise because AMC knew that Wallace Motors was hard pressed financially and in no position to obtain such a large line of credit. Wallace Motors pointed to the fact that AMC awarded the Wilmington franchises to Border Buick after Wallace Motors was terminated as "proof" of the validity of its conspiracy theory. It also adduced evidence that Border Buick was far more successful than Wallace Motors had ever been.
 
 
 17
 AMC claims in its cross-appeal that Wallace Motors did not present sufficient evidence to substantiate its conspiracy theory and that the trial court erred in refusing to grant AMC a new trial or judgment n.o.v.
 
 
 18
 IV. THE DENIAL OF THE MOTION FOR JUDGMENT N.O.V.
 
 
 19
 The movant's burden for a directed verdict is a heavy one. Jordan v. United States Lines, Inc., 738 F.2d 48, 49 (1st Cir.1984). AMC must show that viewing the evidence and all reasonable inferences therefrom in the light most favorable to Wallace Motors, nonetheless, there is "but one reasonable conclusion to which a jury could have come." Hubbard v. Faros Fisheries, Inc., 626 F.2d 196, 200 (1st Cir.1980) (quoting Rios v. Empresas Lineas Maritimas Argentinas, 575 F.2d 986, 989 (1st Cir.1978)). AMC argues that it should have been granted a judgment n.o.v. for two reasons: because Wallace Motors failed to establish that AMC did not act in good faith in terminating Wallace Motors' franchise, as that term is understood under the Dealers Act, 15 U.S.C. Sec. 1222; and because Wallace Motors failed to present competent evidence of damages from the termination.
 
 A. "Good Faith" under the Dealers Act
 
 20
 The Dealers Act provides an automobile dealer a cause of action for damages resulting from the failure of a manufacturer to act in "good faith" in terminating a dealer franchise. The Act defines the obligation to act in "good faith" as follows:
 
 
 21
 The term "good faith" shall mean the duty of each party to any franchises and all officers, employees, or agents thereof to act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party; Provided, That recommendation, endorsement, exposition, persuasion, urging or agument [sic ] shall not be deemed to constitute a lack of good faith.
 
 
 22
 15 U.S.C. Sec. 1221(e). This is the first time the meaning of this provision has come up for review in this circuit. Other circuits, however, have unanimously held that the failure to exercise good faith under the Act has a limited and restricted meaning; lack of good faith does not simply mean unfairness, it must be found in the context of actual or threatened coercion or intimidation. State Distributors, Inc. v. Glenmore Distilleries, 738 F.2d 405, 413 (10th Cir.1984); Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d 901, 911 (9th Cir.), cert. denied, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978); Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608, 610 (7th Cir.), cert. denied, 409 U.S. 981, 93 S.Ct. 317, 34 L.Ed.2d 245 (1971); Salco Corp. v. General Motors Corp., 517 F.2d 567, 571 (10th Cir.1975); Rea v. Ford Motor Co., 497 F.2d 577, 585 (3rd Cir.), cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 561 (2nd Cir.1970). Several circuits have also held that the coercion or intimidation must include a wrongful demand which will result in sanctions if met. Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d at 911; Fray Chevrolet Sales, Inc. v. General Motors Corp., 536 F.2d 683, 685 (6th Cir.1976); Rea v. Ford Motor Co., 497 F.2d at 585.
 
 
 23
 The trial court aptly summarized this case law in its charge to the jury. To show that AMC failed to act in "good faith" Wallace Motors had to prove that AMC's conduct amounted to coercion and that as the result of intimidation or threats, it was forced to act or refrain from acting and that it suffered damage. We agree with those circuits which hold that the coercion or intimidation must include a wrongful demand that would result in penalties or sanctions if not complied with. We also hold that the coercion or intimidation must be actual; the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient.
 
 
 24
 Two questions arise in determining whether Wallace Motors established the necessary degree of coercion: first, whether it adduced sufficient evidence to show that the acts, which it alleged were part of a conspiracy against it, occurred; and second, whether that conspiracy, if established, constituted lack of good faith under the Act. We begin by examining the evidence presented to show each element of the alleged conspiracy, i.e., as to the purpose of the March 1982 meeting between Ristuccia and AMC officials, the oral agreement that a $100,000 floor plan would suffice, the submission of the forged bank documents and false application, and finally as to the pressure on Wallace to give Ristuccia the right of first refusal.
 
 1. The Meeting to Plan the Conspiracy
 
 25
 The record shows that the March 1982 meeting was, in fact, a dinner meeting and that it was held at Ristuccia's private club. It was attended by Ristuccia, Harlan Haywood (AMC's Eastern Regional Manager), Kray, Hanscom and several other AMC personnel. Haywood testified that the meeting was a normal dealer contact, that he was on a tour of the Boston zone dealerships at the time, and that he wanted to meet Ristuccia. In fact, Haywood, Kray and Hanscom had visited Wallace Motors earlier that day in the course of the same tour. Haywood said he did not know whether the meeting had been prearranged by the Boston zone office. Kray and Hanscom both testified that the meeting had been impromptu. They said they had planned to visit Border Buick that day with Haywood and to meet Ristuccia there but that when time ran out they decided to meet him over dinner instead. Ristuccia, on the other hand, testified that the dinner had been arranged a day in advance and that its chief purpose was to honor the high sales performance of his son's dealership, Border Buick. Ristuccia admitted that he did express a passing interest in the Wilmington Renault franchise at the meeting, but said Haywood told him AMC already had a dealer in the area and that the franchise was not an open question. Haywood confirmed that this was the extent of the conversation concerning the Wilmington point.
 
 
 26
 Wallace Motors relied on the apparent inconsistencies in this testimony as to the purpose of the meeting, and on the coincidence of its timing, to create the inference that the meeting was held to plan the conspiracy. The meeting was held after Wallace's request for assistance but before AMC's consent to give it. Wallace Motors also disputed Haywood's assertion that the meeting was a "normal dealer contact" on the ground that Ristuccia (as distinct from Ristuccia's son, the owner of Border Buick) was not an AMC dealer. Wallace Motors' evidence established that an opportunity did exist for Ristuccia and AMC to plan a scheme to oust Wallace.
 
 
 27
 2. The Oral Agreement That a $100,000 Floor Plan Would Suffice
 
 
 28
 Wallace Motors relied exclusively on Wallace's testimony to establish the existence of an oral agreement between Wallace and Kray that Wallace Motors only needed to get a $100,000 floor plan line of credit to qualify for the Renault franchise. On direct examination, Kray denied ever making any such representation or agreement. AMC also presented a mass of documentary evidence to refute the existence of such an agreement. That evidence included several letters to Wallace from Kray and Hanscom stating that the procurement of a $350,000 floor plan line of credit was a firm requirement. One of Kray's letters, dated May 5, 1962, purported to summarize the details of a meeting held on May 3, 1982, between Haywood, Hanscom, Kray and Wallace. The letter contained express references to statements made by Wallace at that meeting to the effect that he would obtain a $350,000 floor plan. At trial, Wallace denied ever making those statements. AMC also introduced several interoffice memoranda and records indicating that Wallace had been informed, and understood, that he had to get a $350,000 floor plan. Among those memoranda was a report written by Hanscom, dated May 10, 1982, detailing the substance of a telephone conversation Hanscom had with Wallace that day. The report stated that Wallace said he would be at the Boston zone office at noon with the required financial documents, that Hanscom reminded him about the $350,000 figure, and that Wallace replied that the floor plan was no longer a problem. Wallace also denied that this conversation ever took place. Kray, Hanscom, and Haywood all testified as to the genuineness of the documents.
 
 
 29
 The direct conflict between Wallace's testimony and the evidence advanced by AMC meant that the jury was faced with a clear choice as to whose account of the facts to believe. The question for us is whether the only reasonable conclusion the jury could have come to was that AMC, and not Wallace, was to be believed. While the letters, documents and testimony advanced by AMC were persuasive, it was the jury's prerogative to decide that they were not persuasive enough.
 
 
 30
 3. The Submission of the Forged Bank Documents and the Falsified Application.
 
 
 31
 The application package consisted of a number of documents. These included, inter alia, a dealer franchise application, a franchise agreement and a dealer facilities report. In addition, Wallace was required to present monthly financial statements for a financial certification form, and to complete a statement detailing Wallace Motors' projected sales. The representation that Wallace Motors had obtained a $350,000 credit line appeared on a number of these forms.
 
 
 32
 Wallace testified that he signed all these forms in blank. He claimed that Hanscom[2] told him to sign them in blank to expedite the process, and that he himself (as distinct from his bookkeeper) was not sufficiently familiar with the numbers and details to provide Hanscom with the necessary input. He said that Hanscom took the information he needed from dealer financial statements Wallace Motors had forwarded to AMC on an earlier occasion. While he conceded that it was possible that he had met with Hanscom over the period the application was being prepared, he denied having any further discussion about the various forms during that time. As for the accompanying bank documents, Wallace disclaimed all responsibility for the forgeries. He testified that he never saw those documents, or the completed forms in the application package, before they were sent to AMC's head office.
 
 
 33
 AMC gave a very different account of what happened. Hanscom flatly denied that Wallace had signed the required forms in blank. He testified that Wallace dropped off the bank documents at the Boston zone office on May 11, 1982. According to Hanscom, Wallace made an appointment that day to come back on May 13 to fill in the other forms. AMC introduced an interoffice report written by Hanscom on May 11, which confirmed these details. Hanscom also testified that he and Wallace worked on the package of forms together over a number of days, somewhere between May 13 and May 18. He said he filled out the details and worked out the calculations for Wallace Motors' projected sales statement, which contained several explicit references to the $350,000 floor plan, strictly on the basis of representations made to him by Wallace. Hanscom's testimony was corroborated by Kray, Martin McNulty, zone operations manager at the Boston office, and Sandra Costello, Hanscom's secretary. All three testified that they saw Wallace working on the application with Hanscom sometime around May 13-15. Kray and McNulty also confirmed that Wallace brought the bank documents to the office on May 11. They testified that they met with Wallace in the office that day and that he told them he had brought the proof of Wallace Motors' $350,000 floor plan with him.
 
 
 34
 Wallace Motors attacked the credibility of AMC's witnesses' testimony on several grounds: the forged bank documents (all of which purported to be from the Century Bank) showed Wallace Motors as having a $350,000 floor plan line of credit in place on April 1, 1982. Wallace Motors asserted that Hanscom had independent knowledge that Wallace Motors had not had that credit line as of that date and that his testimony that he accepted those documents as genuine was, therefore, not believable. Wallace Motors relied on three documents: a letter from Wallace to Hanscom, dated April 22, 1982, in which Wallace stated that Century Bank would not agree to extend Wallace Motors' credit line to $350,000 until after Wallace Motors had obtained the Renault franchise; an AMC dealer contact report written by a district manager, Edward Lodge, dated April 26, stating that the Century Bank had approved only $100,000 of Wallace Motors' requested credit line, which Hanscom admitted to having read, and a letter from Century Bank to Hanscom, dated May 3, guaranteeing payment to AMC for three vehicles worth $30,000. Wallace Motors argued that a letter guarantee would not have been necessary if Wallace Motors had had an unrestricted $350,000 floor plan line of credit at the time. It contended that Hanscom's failure to verify the bank documents in light of this knowledge and his own admission that he was surprised Wallace Motors got the floor plan was further indication that he in fact knew the documents were forgeries. Wallace Motors sought to discredit Kray and McNulty's testimony that Wallace deposited the documents by pointing out that neither Kray nor McNulty could recall seeing Wallace physically carry in those documents, or personally receiving them from him.
 
 
 35
 Wallace Motors made two additional arguments to support Wallace's testimony that he signed all the forms in the application package in blank. The forms were variously dated, May 11, May 13, and May 18, and Wallace Motors argued that since nobody testified to having seen Wallace at AMC's office on more than two occasions, the three different dates recorded showed that at least some of those forms were prepared in Wallace's absence. Wallace Motors also argued that the testimony of Hanscom's secretary that she had seen dealers' signatures on blank financial documents on other occasions made suspect Hanscom and Kray's testimony that franchise application forms were never supposed to be signed in blank.
 
 
 36
 The jury's finding in Wallace's favor was an implicit finding that Wallace was not responsible for the forged bank documents and falsified forms; the trial judge had clearly explained to them that AMC could not be found liable under the Dealers Act if Wallace himself had acted in bad faith. We conclude that there was a reasonable basis for the jury's finding.
 
 
 37
 4. The Pressure to Sign the Right of First Refusal Agreement
 
 
 38
 Wallace Motors drew on several sources to buttress Wallace's testimony that Hanscom would not release the funds promised until Wallace signed the right of first refusal agreement with Border Buick. It introduced a letter addressed to AMC from Border Buick, dated August 30, 1982, in which Border Buick promised to drop its protest and lawsuit if AMC awarded the Wilmington Renault franchise to Wallace Motors. Wallace Motors contended that AMC deliberately omitted to tell Wallace that it had received this letter so that Wallace would continue to think that he had to sign the agreement if he wanted the Renault franchise. Wallace Motors also introduced several preliminary drafts of the right of first refusal agreement, which were found in AMC's files. It relied on the drafts to refute AMC's insistence that AMC was not involved in that agreement in any way. Wallace Motors further claimed that AMC withheld the funds until the last day the Pass and Weisz offer was open, even though the funds were available some few days earlier, to increase the pressure on Wallace to sign. Examining the evidence on this issue in the light most favorable to Wallace Motors, we find it was susceptible to two reasonable but different conclusions.
 
 5. The Culmination of the Conspiracy
 
 39
 Wallace Motors relied on a series of inferences to prove the culmination of the scheme it had alleged. AMC contended that each one of those inferences was unfounded. It relied on testimony by Dennis Soliwoda, the district sales manager who had issued the draft which caused Wallace Motors' credit line to vanish, as well as testimony by Kray and Hanscom, to refute the inferences. Since the inferences had an evidentiary basis, their existence and scope was for the jury.
 
 
 40
 Once Wallace Motors had introduced evidence from which the key elements of the alleged conspiracy could be inferred, all that remained in order to discharge its burden was to show that the objective of that conspiracy had been achieved: the awarding of the franchise to the Ristuccias. A reasonable ground for the probability of a conspiracy having been established we now turn to consider whether such a conspiracy constituted lack of good faith under the Dealers Act.
 
 
 41
 We agree with the other circuits that "good faith" under the Act has a limited and restricted meaning, but have little difficulty in deciding that a conspiracy such as that alleged here does constitute lack of good faith, if established. Indeed, the conduct found to constitute lack of good faith by other circuits pales into insignificance as compared with the seriousness of the conduct alleged here. For some examples of the kind of conduct that has been held to constitute lack of good faith, see McGeorge v. Leyland Motor Sales, Inc., 504 F.2d 52 (4th Cir.), cert. denied, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1974) (where the manufacturer tried to compel the dealer to accept an undesirable line of cars by withholding delivery to the dealer of a highly successful line of cars); Rea v. Ford Motor Co., 497 F.2d 577 (where the manufacturer threatened to cease shipping Ford cars, unless a separate corporation, in which dealer was a principal stockholder, resigned its franchise as an Oldsmobile dealer in a neighboring town); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556 (2nd Cir.1970) (where the manufacturer terminated the dealer because the dealer resisted the manufacturer's coercion to follow the suggested resale price); Randy's Studebaker Sales, Inc., v. Nissan Motor Corp., 533 F.2d 510 (10th Cir.1976) (where the manufacturer used the nonrenewal weapon, as well as curtailment of car deliveries in order to coerce the dealer into a program of retail price fixing); and Shor-Line Rambler, Inc. v. American Motors Sales, 543 F.2d 601 (7th Cir.1976) (where the manufacturer put unreasonable and unrealistic demands on the dealer to build new facilities, increase credit, and make extensive personnel changes, then terminated the dealership when it could not comply.) Collected in Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d at 912.
 
 B. Proof of Damage under the Dealers Act
 
 42
 Wallace Motors claimed damages under several different theories: lost future profits; a sum outstanding on a Small Business Administration loan, alleged to have been obtained in anticipation of having the Renault franchise; and damages for AMC's alleged refusal to repurchase Wallace Motors' inventory on termination of the franchise. AMC challenged both the admissibility and sufficiency of Wallace Motors' evidence of damages.
 
 
 43
 1. The Admissibility of Wallace Motors' Evidence
 
 
 44
 Four exhibits relied on by Wallace Motors to support its damages claim were introduced pursuant to Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. These were: a parts inventory, adding machine tapes listing amounts of warranty work done, automobile sales records and a dealership financial statement. Wallace was the only witness sponsoring these exhibits. He testified that he had been president and owner of Wallace Motors for thirteen years and that he acted as supervisor and director of all departments. AMC maintains that the district court erred in admitting these exhibits because Wallace Motors failed to provide an adequate foundation for them and because their sources and the circumstances of preparation lacked trustworthiness.
 
 
 45
 Federal Rule of Evidence 803(6)[3] allows admission of records of a regularly conducted activity provided that the record was made at or near the time of the events in question by a person with knowledge of the contents of the record, in the course of a regularly conducted business activity, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The determination of whether a foundation has been properly laid for application of Federal Rule of Evidence 803(6) and whether the circumstances indicate lack of trustworthiness is within the discretion of the district court. United States v. Patterson, 644 F.2d 890, 900 (1st Cir.1981); United States v. Cincotta, 689 F.2d 238, 243 (1st Cir.), cert. denied, 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982). As for the requirement that the record-keeping process be attested to by a qualified witness, it is well established that the witness need not be the person who actually prepared the record. United States v. Grossman, 614 F.2d 295, 297 (1st Cir.1980); In Re Japanese Electronic Products, 723 F.2d 238, 288 (3d Cir.1983). A qualified witness is simply one who can explain and be cross-examined concerning the manner in which the records are made and kept. NLRB v. First Termite Control Co., Inc., 646 F.2d 424, 427 (9th Cir.1981).
 
 
 46
 We do not think that the district court abused its discretion in admitting these exhibits. Wallace testified that the inventory parts list was prepared under his supervision. As president and sole stockholder of the company, he was well qualified to attest to the authenticity of the inventory as a business record. We agree with the district court that in light of Wallace's testimony that similar inventories were regularly prepared, the dispute over whether this particular inventory was an ordinary business record or was prepared in anticipation of pending litigation was more properly "cross-examination meat" than a reason to exclude it.
 
 
 47
 Wallace Motors submitted the adding machine tapes in support of its claim that it was never paid, as required by the franchise agreement, for warranty work done totalling $42,000. The tapes contained several columns of numbers respresenting the costs of different instances of warranty work performed by the dealership. Given the extensive detail provided by Wallace on the way in which these tapes were made and the extent to which they were relied upon in the conduct of Wallace Motors' business, we cannot say that the district court abused its discretion in admitting them. It is true that the tapes left something to be desired as far as pinpoint accuracy was concerned but AMC took full advantage of every opportunity to expose the weaknesses of the tapes as evidence. We agree with the district court that the tapes were a business record of Wallace Motors' warranty reimbursement accounting method, and that their evaluation was for the jury.
 
 
 48
 The admissibility of the automobile sales record exhibit is a somewhat closer question. Wallace Motors claimed that it had not received certain promotional benefits to which it was entitled for several cars it had sold and in support of this claim introduced a batch of completed promotion forms. These forms indicated the model eligible for promotion, the serial number of the car sold, the name and number of the person who had bought it and the date of the sale. Wallace testified that the promotional forms were supplied to Wallace Motors by AMC and that the forms were filled out in the regular course of business by office personnel. Although Wallace did not have any underlying documentation relating to the sale of the cars, we will not second-guess the district's finding that Wallace's testimony was a sufficiently trustworthy basis for the introduction of this exhibit.
 
 
 49
 In support of its claim for lost future profits, Wallace Motors introduced a financial statement purportedly detailing the profits it had made from January 1, 1982, to October 30, 1982. The statement reflected a "net profit" of $29,233 for the first ten months of 1982. Wallace Motors claimed that it was entitled to such profits on an annualized basis for ten years into the future for a total of $292,330. Wallace testified at length and in detail as to how and why this and other financial statements were prepared. Here again, the question of admissibility hinged on the absence of underlying documentation. We agree with the district court that Wallace's detailed testimony offset the failure to produce backup documents and that the lack of underlying documentation went to credibility and the weight to be given the financial statement, not to its admissibility.
 
 
 50
 2. The Sufficiency of Wallace Motors' Evidence
 
 The Dealers Act provides:
 
 51
 An automobile dealer may bring suit against any automobile manufacturer engaged in commerce ... and shall recover the damages by him sustained and the cost of suit by reason of the failure of said automobile manufacturer from and after August 8, 1956, to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer.
 
 
 52
 15 U.S.C. Sec. 1222. It is generally agreed that the proper measure of such damages is the profit the dealer would have earned from the franchise for as long as the dealer would have retained the franchise in the future. See Autowest, Inc. v. Peugeot, 434 F.2d at 565. Martin Motor Sales, Inc. v. Saab-Scania of America, Inc., 452 F.Supp. 1047, 1052 (S.D.N.Y.1978), aff'd, 595 F.2d 1209 (2d Cir.1979); Randy's Studebaker Sales, Inc. v. Nissan Motor Corporation, 533 F.2d at 517.
 
 
 53
 As previously held by this court in Jay Edwards, Inc. v. New England Toyota Distributor, 708 F.2d 814, 821 (1st Cir.), cert. denied, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983), damages for lost profits need not be proved with mathematical certainty provided the award has a rational basis in the evidence.[4] See also Ford Motor Co., v. Webster's Auto Sales, Inc., 361 F.2d 874, 885 (1st Cir.1966).
 
 
 54
 Nevertheless, there is a distinction between proof which allows the jury to make a "just and reasonable inference" of damages and proof which only provides a basis for "pure speculation or guesswork." Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 579-80, 90 L.Ed. 652 (1946). Factors which the courts consider in determining whether the evidence of lost profits is sufficient to warrant an award of damages include: whether the plaintiff explained the assumptions on which the profit projections were based, Autowest, 434 F.2d at 566; Marquis v. Chrysler Corp., 577 F.2d 624, 638 (9th Cir.1978), whether the defendant had an opportunity to expose inconsistencies, inadequacies or inaccuracies in the plaintiff's testimony either by cross-examination or summation, Autowest, 434 F.2d at 565. Jay Edwards, 708 F.2d at 821; Kingsport Motors, Inc. v. Chrysler Motors Corp., 644 F.2d 566, 569 (6th Cir.1981); and whether the defendant could have presented evidence of its own to indicate what the outer limits of the plaintiff's damages might have been. Jay Edwards, 708 F.2d at 822; Marquis, 577 F.2d at 638; Kingsport Motors, Inc. v. Chrysler Motors Corp., 644 F.2d 566, 569 (6th Cir.1981). The legal sufficiency of the financial statement introduced by Wallace Motors must be determined with reference to these factors.
 
 
 55
 AMC attacks the financial statement on the grounds that Wallace Motors selected the January-October 1982 period in order to inflate its damages claims, and because it was not supported by either a track record of past profitable operations or expert testimony. It contends further that the statement was misleading because, as the statement itself indicated, approximately seventy percent of Wallace Motors' sales revenue for 1982 was generated from used car sales and not from sales of AMC/Jeep vehicles. AMC claimed that a 1981 financial statement prepared for Wallace Motors by an independent accounting firm, indicating a net loss for 1981, was a more persuasive indicator of Wallace Motors' relative profitability.
 
 
 56
 Wallace Motors defended its introduction of the 1982 financial statement on the ground that it "turned the corner" in 1981, after it hired more personnel, upgraded its facilities and expended additional monies on advertising. Wallace Motors conceded that it had an unprofitable year in 1981. It attributed this, however, to several factors: AMC products were not selling well by AMC standards that year; its interest costs were increased in 1981 as a result of a working capital loan it had taken out; and to the fact that it purchased a substantial amount of depreciable assets that year.
 
 
 57
 We are not persuaded that Wallace Motors' evidence was so conjectural as to warrant a finding that the jury's $100,000 award had no rational basis. Wallace Motors explained its method of calculating future profits to the jury and AMC's cross-examination fully exposed the weaknesses of its projection of lost future profits. As might be expected, AMC's summation also pointed out the faults in the lost profits evidence. Moreover, the jury also had a copy of the 1981 financial statement to assist them in assessing the accuracy of the 1982 counterpart. AMC's claim that the statement was misleading because it failed to indicate what revenues were generated from used car sales and what from new car sales is not persuasive; the record shows that the jury was fully informed of the extent of Wallace Motors' used car business.
 
 
 58
 Nor are we persuaded by AMC's arguments relating to the other elements of Wallace Motors' damages claims. The first has to do with the claim that AMC should assume Wallace Motors' obligation on a Small Business Administration loan in the amount of $194,909.71. AMC's second argument goes to Wallace Motors' attempt to recover for AMC's alleged refusal to repurchase Wallace Motors' inventory. It argues that this claim is barred by Wallace Motors' admission that it failed to provide AMC with any inventory list and because Wallace Motors adduced no evidence as to the ultimate disposition of the inventory and, therefore, there was no evidence of injury. AMC's arguments on both of these claims go solely to the weight and credibility of the evidence. The jury was made aware of the weaknesses in the claims and the size of its verdict ($125,000) shows that it did not accept the evidence unreservedly. We see no reason to disturb the jury's verdict on damages.
 
 V. THE DENIAL OF THE MOTION FOR A NEW TRIAL
 
 59
 A motion for a new trial is only warranted if the verdict was "so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice." Valm v. Hercules Fish Products, Inc., 701 F.2d 235, 237 (1st Cir.1983) (quoting Hubbard v. Faros Fisheries, Inc., 626 F.2d at 200). The verdict in this case was reasonably supported by the evidence. While we would not have found the verdict unreasonable if the jury had gone the other way, we believe that it was not a "manifest miscarriage of justice" for it to find in Wallace Motors' favor. We, therefore, conclude that the district court did not abuse its discretion by refusing to grant a new trial.
 
 
 60
 VI. WALLACE MOTORS' APPEAL FROM THE DISTRICT COURT'S RULINGS ON THE CHAPTER 93A AND B CLAIMS
 
 
 61
 A. The District Court's Authority to Make Independent Findings of Fact
 
 
 62
 On ruling in AMC's favor on the claims presented by both sides under Mass.Gen.Laws Ann. ch. 93A and B, Judge Mazzone stated:
 
 
 63
 The plain fact of the matter is that I considered exactly the same evidence that the jury considered during the course of this case, and I have come to exactly the opposite conclusion. I see no point in requiring extensive suggested findings and rulings since the matter is clearly inconsistent. In other words, I note the jury's verdict on these claims and I tell you at the outset that I do not agree with--[sic ] I agree that the jury could reach the verdicts that it reached and, of course, the verdicts will stand. I'll leave it to counsel as to whether they wish to file some pleadings directed to that. But as a matter of my independently findings [sic ] facts on exactly the same evidence, I do not believe Mr. Wallace and, consequently do not believe that the plaintiff has proven by a preponderance of the evidence its claims under 93B and do find that the plaintiffs in counterclaim have proven their claims under 93A.
 
 
 64
 The question is whether the district court violated Wallace Motor's seventh amendment right to a jury trial[5] by deciding the chapter 93A and B claims contrary to the findings of the jury on the issues submitted to it. We begin our analysis by a brief look at the nature of the chapter 93A and B claims.
 
 
 65
 Mass.Gen.Laws Ann. ch. 93A, Sec. 2 provides:
 
 
 66
 (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
 
 
 67
 (b) It is the intent of the legislature that in construing paragraph (a) of this section in actions brought under sections four, nine and eleven, the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.
 
 Section 9(1) explains that:
 
 68
 Any person ... who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two or any rule or regulation issued thereunder ... may bring an action in the superior court, ... whether by way of original complaint, counterclaim, cross-claim or third party action, for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.
 
 
 69
 Chapter 93B, Sec. 12A which specifically prohibits unfair or deceptive business practices as between motor vehicle manufacturers, distributors and dealers provides:
 
 
 70
 Any franchisee or motor vehicle dealer who suffers any loss of money or property, real or personal, as a result of the use or employment by a manufacturer, wholesaler, distributor, distributor branch or division, factory branch or division, wholesale branch or division, or any agent, servant or employee thereof, of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by sections three through eleven, inclusive, or by any rule or regulation issued under paragraph (c) of section three may bring an action in the superior court for damages and equitable relief, including injunctive relief.
 
 
 71
 As already indicated, supra n. 1, Wallace Motors and AMC have agreed that there was no right to a jury trial on the chapter 93A and B claims, relying on the authority of Nei v. Burley, 446 N.E.2d at 679. Although the Nei court did not explicitly address the seventh amendment requirement, we believe that the reasoning employed by the Massachusetts Supreme Judicial Court in Nei is determinative of the seventh amendment issue.
 
 
 72
 The plaintiff in Nei appealed the denial of his demand for a jury trial on a chapter 93A claim. He pointed out that chapter 93A, Sec. 9(1), as originally written, provided that an aggrieved consumer might "bring an action ... in equity for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper," 1969 Mass.Acts c. 690. The legislature subsequently struck the words "in equity" in response to the procedural merger of law and equity engendered by the adoption of the Massachusetts Rules of Civil Procedure. Mass.Gen.Laws Ann. ch. 93A, Sec. 9(1), as amended through 1978 Mass.Acts c. 478, Sec. 45. Nei urged that the court descry a legislative intent to confer a trial by jury from the elimination of these words. The court found this argument "less than compelling because the Legislature left undisturbed multiple references to the 'court' in Sec. 9." Nei v. Burley, 446 N.E.2d at 677.
 
 
 73
 The court went on to determine whether the legislature intended to confer a right to jury trial. It noted that Sec. 2(b) directs the Massachusetts courts to construe the terms "unfair or deceptive acts or practices" and "unfair methods of competition" in a manner consistent with the interpretation of those terms under the Federal Trade Commission Act, and that the statute dispensed with the need to prove many of the essential elements of the common law claims of breach of contract, fraud, and deceit. The court held that the statute created a sui generis cause of action which was intended to grow and change with the times and which was not analogous to traditional common law claims. 446 N.E.2d at 678.
 
 
 74
 The court also addressed the constitutionality of the statute under Article 12 of the Massachusetts Declaration of Rights, which guarantees that "no subject shall be deprived of his property but by the judgment of his peers or the law of the land." The court emphasized that the legislature could not eliminate a right to jury trial that was founded on a constitutional guarantee. 466 N.E.2d at 678 (quoting Commonwealth v. One 1972 Chevrolet Van, 385 Mass. 198, 431 N.E.2d 209 (1982)). It concluded, however, that the statute did not offend this constitutional guarantee because consumer actions were historically equitable in nature, and also because the statute created new substantive rights making conduct previously lawful under common and statutory law, unlawful. 446 N.E.2d at 678-79.
 
 
 75
 Beacon Theatres v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959), is the ruling authority on the effect of the seventh amendment on cases in which legal and equitable claims are joined. The issue arose in Beacon Theatres when Fox West Coast Theatres asked for declaratory relief against Beacon Theatres after Beacon notified it that certain Fox exclusive 'first run' contracts with movie distributors violated the Sherman Act (15 U.S.C. Secs. 1, 2) and threatened to sue for treble damages. Fox asked for a declaration that its contracts were legal and for an injunction, pending final resolution of the litigation, prohibiting Beacon from bringing an antitrust suit against Fox or its distributors. Beacon answered with a counterclaim for damages and demanded a jury trial on the factual issues as provided by Federal Rule of Civil Procedure 38(b). The district court held that the issues raised by the complaint for declaratory relief were essentially equitable. Acting under the purported authority of Federal Rules of Civil Procedure 42(b) and 57, it ordered those issues tried to the court before a jury determination of the antitrust charges contained in the counterclaim and cross-claim. Beacon then petitioned for a mandamus to vacate the district court's order.
 
 
 76
 The Court of Appeals for the Ninth Circuit recognized that the district court's order could have the effect of depriving Beacon of the opportunity of having a jury decide every issue bearing on its treble damages suit since the reasonableness of certain of the contract terms between the parties was an issue common to the complaint for declaratory relief, the counterclaim and the cross-claim. The court noted that the district judge's ruling on that issue could operate either by way of collateral estoppel or res judicata so as to conclude both parties with respect thereto at the subsequent trial of the damages claim. Beacon Theatres, 359 U.S. at 504, 79 S.Ct. at 953 (quoting Beacon Theatres, 252 F.2d 864, 874 (9th Cir.1958)). Nevertheless, the court of appeals refused to upset the district court order.
 
 
 77
 The Supreme Court reversed. It held that a court's authority to hear the equitable issues ahead of the legal issues could not be determined on the basis of cases decided before the enactment of the Federal Rules and the Declaratory Judgment Act. 359 U.S. at 507. Noting that the basis of injunctive relief in the federal courts had always been irreparable harm and inadequacy of legal remedy, the Court stated that at least as much was required to justify a trial court's using its discretion under the Federal Rules to allow claims of equitable origin to be tried ahead of legal ones, since this had the same effect as an equitable injunction on the legal claims. Id. It held that a trial court exercising such discretion should assess the possibility of irreparable harm and the inadequacy of the legal remedies in light of the remedies made available under the Federal Rules and the Declaratory Judgment Act. Id. The Court concluded that the trial court's use of its Rule 42(b) discretion to deprive Beacon of a full jury trial on its legal claims could not be justified. Id. at 508, 79 S.Ct. at 955.
 
 
 78
 The Court went on to explain that the liberal joinder provisions of the Federal Rules allowing legal and equitable causes to be brought in one action meant that the justification for equity's deciding legal issues once it obtained jurisdiction had to be "re-evaluated." Id. at 509, 79 S.Ct. at 956. The Court conceded that cases could arise where the availability of declaratory relief or joinder in one suit would not protect the plaintiff seeking relief from irreparable harm while affording a jury trial in the legal cause. Id. at 510, 79 S.Ct. at 956. But it emphasized that the trial court's discretion in deciding whether to try the legal or equitable cause first in such a situation was very narrowly limited, and that the discretion should be exercised to preserve the constitutional right to jury trial wherever possible. Id. The right to a jury trial of legal issues, it held, should only be allowed to be lost through prior determination of equitable claims, in the most imperative of circumstances. Id. at 511, 79 S.Ct. at 957.
 
 
 79
 Nothing in Beacon Theatres requires us to hold that Wallace Motors' seventh amendment rights were violated below. Beacon Theatres prohibits a trial judge from depriving a party of its constitutional right to a jury trial by ruling on the equitable claims first with the result that the legal claims become barred by the operation of collateral estoppel principles. None of the plaintiff's claims were barred here. Wallace Motors received a full jury trial on all the claims it was entitled to have tried to a jury. Judge Mazzone did nothing to prejudice that trial and scrupulously refrained from disclosing his own findings until after the jury had returned its verdict. Indeed, his respect for the jury's prerogative to make its own findings on the claims tried to it is exemplified by his refusal to grant judgment n.o.v. despite his disagreement with that verdict.
 
 
 80
 Wallace Motors also relies on a line of cases involving the Civil Rights statutes, 42 U.S.C. Secs. 1981-88 and the Clayton and Sherman statutes, 15 U.S.C. Secs. 1 et seq. These statutes are fundamentally different from chapter 93A and B; inherent in the federal statutes is a right to a trial by jury. A party suing or being sued under the federal statutes has the right to have a jury decide whether the statute has been violated. A trial judge cannot usurp that right by independently determining the question of liability. Thus in deciding whether to grant the equitable relief also provided for by the statute, the judge is required, in accordance with the Beacon Theatres rule, to accept the jury's finding of fact. See 9 C. Wright and A. Miller, Federal Practice and Procedure Sec. 2338 at 134-35 (1971).
 
 
 81
 Judge Mazzone's role in the present case was very different. There being no right to a jury trial under chapter 93A and B, it was for him to decide both whether the statute had been violated and what kind of relief was warranted. Wallace Motors' position is also significantly different from that of a plaintiff who seeks both legal and equitable relief under a statute which provides for both forms of relief. Such a plaintiff has only one cause of action, the violation of the statute. Wallace Motors, on the other hand, had several separate and distinct causes of action. Whether the common law and Dealers Act claims had been proven was for the jury to determine; whether the chapter 93A and B claims had been proven was for the trial judge.
 
 
 82
 Wallace Motors does cite two cases, Dybczak v. Tuskegee Institute, 737 F.2d 1524 (11th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1180, 84 L.Ed.2d 328 (1985); and Bouchet v. National Urban League, Inc., 730 F.2d 799 (D.C.Cir.1984), which more closely approximate the situation here. They involved the joinder of a statutory cause of action for which no right to a jury trial was provided, Title VII, 42 U.S.C. Sec. 2000e, with distinct jury claims. Both cases suggest that a judge is bound to accept the jury's finding of fact in deciding whether to give Title VII relief. Dybczak, 737 F.2d at 1527; Bouchet, 730 F.2d at 803-04.
 
 
 83
 After a careful reading of those cases, we conclude that they do not support Wallace Motors' argument. Neither case squarely decides that a judge hearing a Title VII claim that has been joined with separate jury claims is bound by the jury's findings. We regard this an an open question. Moreover, Title VII is significantly different from chapter 93A and B, both in purpose and scope, and in the nature of the relief it provides. We recognize that there may be reasons for holding a judge bound by the jury's finding of fact where the Title VII claim is joined with separate legal claims which do not apply in a chapter 93A and B context.
 
 
 84
 We hold that joining the Massachusetts 93A and B claims with the jury claims did not convert them into "suits at common law" entitled to a jury trial under the seventh amendment.
 
 
 85
 B. AMC's Standing to Bring a Chapter 93A Claim
 
 
 86
 Wallace Motors challenges AMC's standing to bring the 93A action. It concedes that this issue was not raised at trial but argues that it can pursue it on appeal because it raised the issue in its pleadings. The rule in the First Circuit is clear: "It is by now axiomatic that an issue not presented to the trial court cannot be raised for the first time on appeal." Johnston v. Holiday Inns, Inc., 595 F.2d 890, 894 (1st Cir.1979). The question remains whether raising an issue in the pleadings meets the requirement of "presenting" the issue to the trial court.
 
 
 87
 In In Re Linda Coal and Supply Co. v. L.H. Haberman and Son, 255 F.2d 653 (3d Cir.1958), the Third Circuit addressed a similar situation where appellant claimed a theory on appeal which was not raised at trial but had been raised in the pleadings. In that case, the court refused to consider the alternative theory "which at best was raised only inferentially in the pleadings," id. at 656, and held that if neither the pleadings nor the evidence at trial were "permeated" with the alternative theory, it could not be raised on appeal. We adopt the reasoning of the Third Circuit.
 
 
 88
 A review of the pleadings in this case reveals only the barest inference of a challenge by Wallace Motors to AMC's chapter 93A claim. AMC alleged that Wallace Motors violated chapter 93A in its counterclaim and third-party complaint and requested treble damages. Wallace Motors denied the allegation in its answer and asserted, as its second and third defenses, that AMC's counterclaim and third-party complaint failed in toto to state a claim upon which relief could be granted. Wallace Motors never specified its grounds for challenging any of AMC's claims nor did it ever identify the issue now before the court, that AMC was ineligible to bring a chapter 93A claim. We find that the issue of AMC's eligibility to bring a chapter 93A claim was not sufficiently presented to the trial court by the pleadings and cannot be raised now. Nor does the claim come within any of the exceptions allowing de novo appellate review. Johnston v. Holiday Inns, Inc., 595 F.2d at 894.
 
 
 89
 Affirmed. No costs to either party.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 "[T]here is no right to a trial by jury for actions cognizable under G.L. c. 93A." Nei v. Burley, 388 Mass. 307, 446 N.E.2d 674, 679 (1983). The parties agreed that the same rule applies to an action cognizable under chapter 93B
 
 
 [2]
 As AMC's regional sales manager in the Boston zone, Hanscom was responsible for forwarding Wallace Motors' application to the head office
 
 
 [3]
 Federal Rule of Evidence 803(6) provides:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 ....
 (6) Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
 
 
 [4]
 Moreover, as pointed out in Jay Edwards, Inc. v. New England Toyota Distributor, 708 F.2d 814, 821 (1st Cir.), cert. denied, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983), a defendant whose wrongful conduct created the difficulty of ascertaining the precise damages suffered by the plaintiff is not entitled to complain that the damages cannot be measured with the same exactness and precision that would otherwise be possible. See also Bigelow v. RKO Pictures, 327 U.S. 251, 263, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)
 
 
 [5]
 The seventh amendment states: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."